UNITED STATES of America,
Plaintiff-Appellee,

v.

Vance DYAR, Mark M. Streeter, and
Clement J. DeMatto,
Defendants-Appellants.

No. 77–5481.

United States Court of Appeals,
Fifth Circuit.

June 16, 1978.

Rehearings Denied Aug. 9, 1978.

Robert F. Clark, Mobile, Ala., for Vance Dyar.

Robert G. Gilder, Southaven, Miss., for Mark M. Streeter.

Bryan M. Cavan, W. Michael Maloof, Decatur, Ga., for Clement J. DeMatto.

John L. Briggs, U. S. Atty., Lee S. Carlin, Robert S. Yerkes, Asst. U. S. Attys., Jacksonville, Fla., for plaintiff-appellee.

Before TUTTLE, COLEMAN, and CLARK, Circuit Judges.

COLEMAN, Circuit Judge.

Clement J. DeMatto, Mark M. Streeter, and Vance Dyar appeal their convictions of conspiracy to import marijuana, 21 U.S.C., § 963 (Supp., 1978), and of conspiracy to possess with intent to distribute marijuana, 21 U.S.C., § 846 (Supp., 1978).

DeMatto challenges the sufficiency of the evidence to support his conviction. The challenge is well taken. We reverse DeMatto's conviction and remand with directions to enter a judgment of acquittal.

Streeter questions the sufficiency of the evidence and, as does Dyar, contests the denial of standing for the suppression of certain testimony as being the fruit of an illegal search. Finally, Streeter and Dyar complain that the indictment charging both conspiracy to possess and to import marijuana was both duplicitous and amounted to double jeopardy. The convictions of Streeter and Dyar are affirmed.

On August 11, 1975, Dyar phoned Robert David Fleming, a government witness and an unindicted co-conspirator, to inquire if Fleming would accept a pilot's position with Memphis Productions, allegedly an organization of rock music promoters. The next day Fleming flew to Memphis to see about the job proposition. Dyar and Streeter met Fleming at the Memphis airport and took him to Memphis Quality Inn East.

Upon arrival at the motel, Fleming talked to Gary Pagels and Dyar about the feasibility of transporting rock music groups and hunting expeditions to various destinations, inside and outside the Country. Later on, the subject of marijuana importation came up when Dyar proposed to furnish the necessary cash outlay for the air charter business from profits to be realized from a marijuana run .to Colombia, South America. After Fleming had agreed to pilot the aircraft on which the marijuana would be imported, he met DeMatto. DeMatto was introduced as the man with the rock group connections and as the street distributor of the grass but made no comment in response to that description. Following the introduction and after some small talk, DeMatto asked Fleming if he was "going to help out with *this thing*" (Emphasis added). Fleming responded affirmatively. DeMatto "appeared to be

pleased" and said that he would be back in touch with Fleming, but was never again in contact with him.

During the marijuana discussions, Streeter was in and out of the motel room.

Later that day, Dyar, Pagels, Neal Perks, and Fleming flew from Memphis to Hamilton, Alabama, to inspect the aircraft which Dyar planned to use in the marijuana run. Fleming concluded that the plane was not airworthy, but he and Perks flew the plane to an airport south of Memphis, where it was impounded by the F.A.A.

Left without a plane, Dyar, Pagels, and Fleming went to Jackson, Mississippi, on August 15 to procure a plane from Hankins Aviation. Pagels and Fleming negotiated the lease of an aircraft for one month. Pagels paid the entire rental price and executed the lease in the name of Memphis Productions, signing in the name of Mark M. Streeter, but Streeter was not there and had not participated in the negotiations.

That evening, Perks and Fleming flew the rented plane to Bekin Airport in Mobile, Alabama, for a rendezvous with Pagels and Dyar. On the next morning, the plane was refueled and some furniture was removed to increase cargo load capacity. All expenses incurred at Bekin were paid in cash by Dyar.

After the modifications were completed, Fleming, Dyar, and Perks took off for Colombia, South America, via Haiti. Radio difficulties developed shortly after take-off and forced Fleming to land at Orlando. When it was discovered that the repairs would take several days, the trip to Colombia was postponed, and Dyar and Perks left the Orlando area.

On Wednesday, August 21, Fleming phoned Pagels to inform him that the radio malfunction had been corrected and to reschedule the flight for Saturday. Again on Friday, Fleming called Pagels. Pagels told him that Perks would join him in Orlando on Saturday and that Dyar would meet them at their destination.

Saturday morning, Fleming and Perks filed a phony flight plan for the Bahamas but flew to Colombia, South America, to pick up a load of marijuana. Upon their arrival, they were greeted by Rick Barker who claimed to be in charge of the Colombian end of the operation.

On Sunday morning, Fleming and Perks departed Colombia and arrived stateside that evening. As instructed by Barker, they landed the plane at Keystone Heights airport, in Florida, where they left it. They hitched a ride to Gainesville, Florida, where they parted company.

Tuesday morning, Fleming's wife phoned him at work to notify him that officials of the Florida Law Enforcement Agency were en route to arrest him. Fleming immediately called Pagels to advise him that the cops were on their way to arrest him and to tell Pagels the story he would relate to the police. Fleming was arrested and charged with possession of a controlled substance. Fleming posted bail and was released from jail on Wednesday.

On Thursday, Fleming called Pagels to ascertain what steps Memphis Productions would take next.

It was at this point that Streeter reenters the picture. On Friday, Streeter flew to Orlando to see Fleming. Streeter asked Fleming what story had been given to the police, leaving Fleming with the impression that Streeter wanted to ensure the stories were straight and together. Fleming replied that he had told the police that someone from Memphis Productions had loaned the aircraft to two persons for the weekend, that he had given them instructions on flying the plane, had aided them in filing a flight plan, and that he had not since seen or heard from them. Streeter stated that they would abide by that story.

In September of 1976, over one year later, Fleming agreed to testify for the government in exchange for immunity.

On February 9, 1977, a joint indictment was returned against DeMatto, Dyar, and Streeter, along with four other persons, charging them with the offenses of conspiracy to import marijuana and conspiracy to possess marijuana with the intent to distribute. They were tried and convicted on both counts.

## I
### Sufficiency of the Evidence
#### a. Clement DeMatto

■ DeMatto claims that because the evidence was insufficient to convict him the District Court erred in the denial of his motion for judgment of acquittal. As to several individuals a conspiracy no doubt existed. Did the proof adequately connect DeMatto with that conspiracy? As indicated at the outset, we think not.

Fleming, the pilot, was the sole witness against DeMatto. According to his testimony DeMatto came by the meeting at the Quality Inn East but he was there for less than ten minutes after the other participants had been discussing rock groups-marijuana transportation for about an hour and a half. Obviously, DeMatto could not have known of the marijuana conspiracy because it had just been agreed upon.

On direct, cross, and re-direct examination, Fleming gave four versions of DeMatto's "introduction" to those present.

His first version was that:

"He was introduced as Clem and that Clem had connections with a lot of these rock groups and had connections with respect to moving this marijuana after it reached the United States in distributing it."

He was then asked what DeMatto had said to him after the introduction and he responded:

"Other than some general small talk, the main thing he said was 'are you going to help us out on this thing?' and I said 'yes'."

His second version of what happened was:

"General all around introduction, few familiarities—just general small talk for a few minutes and then finished up with the words to the effect 'well, are you going to help us out on this thing?' and I agreed affirmatively that I would and he said 'well, good. I will be talking to you later on', and he left."

The third version was:

"[I was told] [T]hat his name was Clem and that Clem was the man who was going to help distribute this material when it was brought back to this country."

Fleming then proceeded to say that nothing else "significant" was said that he could recall, that DeMatto did not mention marijuana in connection with helping out with "this thing".

Ultimately, Fleming recited the fourth version:

"At the time Mr. DeMatto was introduced to me it was stated that this was Clem and Clem has a connection with a lot of these rock groups and also has some friends who are going to be in position to distribute this marijuana when we get it back."

After the brief visit to the motel room, DeMatto totally disappears from the case. Fleming testified that he never saw him again, never talked with him on the telephone, that he had no further contact with DeMatto at all.

In conclusion, Fleming was asked if "Clem" ever "told you he was going to do that (participate in the marijuana operation) and he responded, "No, sir".

The government argues that DeMatto's conviction should stand because he remained silent when he was introduced as one who would help with the marijuana distribution and because he asked Fleming if he was going to help with "this thing".

On the question of silence, it must first be noted that according to the first version of the introduction it was merely said that DeMatto had "connections", not that he had agreed to participate in the conspiracy. According to the second version, there was "general small talk for a few minutes", no mention of marijuana. The third version was that Clem "was the man who was going to help distribute this material when it was brought back to this country". This, however, was not an accusing statement with reference to past misconduct; it was a prediction, which, obviously, DeMatto had not agreed to. The fourth version was that "Clem had connections with a lot of those rock groups and had friends who are going

to be in position to distribute this marijuana" when the actors got it back. Finally, Fleming admitted that DeMatto had never told him that he was going to participate in the marijuana operations.

■ It is well established in the law of conspiracy that before being entitled to a conviction the government must prove by the evidence beyond a reasonable doubt not only that a conspiracy did, in fact exist, (as existed here among several of the actors) but also that the defendant knew it and, with that knowledge, agreed to take part in it. Suspicion is not enough and guilty participation in a conspiracy may not be inferred from mere association.

Upon a painstaking review of Fleming's testimony, undertaken in light of the government's burden of proof, but construing the evidence in the light most favorable to the verdict, we are left with the firm conviction that the prosecution wholly failed to carry its burden. It failed to prove that when he entered the room De-Matto knew of the conspiracy which had been hatched by the other participants within the past thirty minutes. It certainly failed to prove that DeMatto agreed to participate in it.

Fleming did swear that DeMatto asked him if he was going to help them with "this thing"—no elaboration as to whether "this thing" was flying rock groups or importing marijuana or distributing marijuana. Fleming neither quoted nor paraphrased any conversation about marijuana while DeMatto was in the room. To the contrary, he concluded his testimony by saying that DeMatto had never told him that he would help with the marijuana undertaking.

In our view, after this careful analysis of the proof, DeMatto's conviction is supported only by suspicion or a ten minute association with the actual conspirators, or both. This is simply not enough and we cannot, in good conscience, affirm the guilty verdict as one which a reasonably minded jury could have reached from the evidence beyond a reasonable doubt.

#### b. *Mark Streeter*

■ The evidence introduced to tie Streeter into the conspiracy consists of the following: (1) that Streeter, along with Dyar, met Fleming at a Memphis airport; (2) that Streeter was in and out of the motel room during the discussions about a marijuana run; and (3) that after Fleming's arrest, Streeter flew to Orlando to discuss with Fleming the alibi given to the police.

Streeter argues that the essence of the discussions held in Orlando is inadmissible hearsay and that the remaining evidence is insufficient to sustain his conviction. Clearly, the testimony disclosing Streeter's meeting Fleming at the Memphis airport and Streeter's on and off presence in the motel room while others were doing the talking was not enough to connect Streeter with the illegal conspiracy. *Causey v. United States*, 5 Cir., 1965, 352 F.2d 203. Unfortunately for Streeter, however, his activities did not stop there. A reasonably minded jury could infer from Streeter's trip to Orlando and his own conversation with Fleming that he most assuredly knew of the conspiracy, that his interest in it exceeded that of an uninvolved bystander, and that he had a vital stake in concealing it.

#### II

#### *Double Jeopardy*

■ Dyar and Streeter contend that the indictment charging both conspiracy to possess with intent to distribute, 28 U.S.C. § 846, and conspiracy to import marijuana, 21 U.S.C. § 963, was duplicitous; that multiple punishments were imposed for a single offense in derogation of their constitutional guarantee against double jeopardy. Dyar views the indictment, charging conspiracy to import and to possess marijuana, as an attempt to expand a single conspiratorial agreement embracing dual illegal objectives into multiple conspiracies. Using a slightly different phrasing, Streeter claims that he was indicted for two offenses which arose out of the same transaction.

**1390**

These arguments are rejected on the authority of *United States v. Houltin*, 5 Cir., 1976, 525 F.2d 943, 950, vacated on other grounds, *sub nom Croucher v. United States*, 429 U.S. 1034, 97 S.Ct. 725, 50 L.Ed.2d 745. *See also, United States v. Houltin*, 5 Cir., 1977, 553 F.2d 991.

Moreover, the appellants received concurrent sentences on the two counts.

### III

#### Standing

Prior to trial, Dyar and Streeter moved to suppress the testimony of Fleming because, they say, Fleming's identity was learned through an illegal search of the airplane which landed in Florida. The District Court concluded that the defendants were without standing to raise the challenge. Dyar and Streeter urge that their proprietary interest in the aircraft conferred standing.

It is well settled that the testimony of a witness whose identity has been discovered through an illegal search must be suppressed "unless the government can show: (1) the identity of the witness originated from an independent source; . . . [or] (2) the identity of the witness discovered from the original illegal seizure has become so attenuated as to remove the original taint", *United States v. Marder*, 5 Cir., 1973, 474 F.2d 1192, 1196.

■ The decisive factor is whether the complaining individual had a reasonable expectation of privacy in the premises searched or the thing seized. Generally, a defendant will satisfy standing requirements (1) if he has a proprietary or possessory interest in the place searched or the object seized adequate to give rise to a reasonable expectation of privacy, (2) if he was on the premises at the time of the contested search and seizure, or (3) if he is charged with an offense that includes as an essential element, possession of seized evidence, *United States v. Hunt*, 5 Cir., 1974, 505 F.2d 931, *cert. denied*, 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975); *Accord, Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

Dyar maintains that his accompanying Pagels and Fleming to Jackson to rent the aircraft and his payment for fuel at Bekin Airport in Mobile adequately demonstrates his proprietary interest in the airplane. Streeter points to the presence of his name on the lease of the plane, although he was not there and did not sign the instrument, to indicate his property interest.

■ Traditional or common law theories of property rights do not automatically confer standing to challenge a search. Property rights in absence of reasonable expectations of privacy in property cannot support a Fourth Amendment claim, *United States v. Hunt, supra*. Ownership or a leasehold interest must be accompanied by a cognizable privacy interest in the place or thing searched, *United States v. Nunn*, 5 Cir., 1976, 525 F.2d 958 (ownership); *United States v. McConnell*, 5 Cir., 1974, 500 F.2d 347 (lease), *cert. denied*, 420 U.S. 946, 95 S.Ct. 1327, 43 L.Ed.2d 424 (1975). In *United States v. Nunn, supra*, we held that a defendant who owned, but who was not driving, a truck when it was seized had no reasonable expectation of privacy and lacked standing to challenge search and seizure of the truck. The facts of *United States v. McConnell, supra*, differ slightly. There the defendant, who paid for the lease of a vehicle which was in the possession of a codefendant, and not of the defendant, when the search occurred, had no expectation of privacy and lacked standing to object to the legality of the search.

■ Even if we were to assume that Streeter and Dyar had a leasehold interest in the searched aircraft sufficient to create a traditional property right, when they gave possession to Fleming they abandoned any expectation of personal privacy in the aircraft. *See, United States v. Mendoza*, 5 Cir., 1972, 473 F.2d 692. Streeter and Dyar, therefore, lacked standing to contest the legality of the search.

■ Not only did Streeter and Dyar fail to satisfy the reasonable expectation of privacy requirement for the Fourth Amend-

ment test of standing, they were not victims of a search or the ones against whom the search was directed. They were merely persons claiming prejudice through the introduction of damaging evidence gathered as a consequence of a search directed at someone else, *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Jones v. United States, supra.* "[C]o-defendants and co-conspirators may not assert the Fourth Amendment rights of their alleged partners in crime solely on the basis of their interpersonal association", *United States v. Hunt, supra,* 505 F.2d at 939.

The convictions of Dyar and Streeter are AFFIRMED.

DeMatto's conviction is REVERSED. As to him, the case is remanded for the entry of a judgment of acquittal.