UNITED STATES of America

v.

Edward Frederick PETRULLA et al.

No. 78–141 Cr. J–C.

United States District Court,
M. D. Florida,
Jacksonville Division.

Oct. 13, 1978.

Curtis S. Fallgatter, Asst. U. S. Atty., Jacksonville, Fla., for plaintiff.

Michael Doddo, Miami, Fla., for Edward Frederick Petrulla.

Jack R. Blumenfeld, Miami, Fla., for Geoffery Bain Tannhauser.

John Steven Berk, Fort Lauderdale, Fla., for Charles Thomas Purcell.

Carlton P. Maddox, Jacksonville, Fla., for Carl Billy Knowles.

Patrick A. Podsaid, Miami, Fla., for Arthur John Loye.

Alan S. Ross, Miami, Fla., for Robert Ernest Allen.

Joseph H. Kelinson and Joel R. Magazine, Miami, Fla., for Marvin Paul Leask, John Doe, aka Bradley.

Reese A. Waters, Jr., Orange Park, Fla., for Ralph Pool.

Wayne E. Flowers, Jacksonville, Fla., for Manuel Ospina.

Louis R. Hardin, Jr., Jacksonville, Fla., for Miguel Saiz Monroy.

William J. Dorsey, Jacksonville, Fla., for Lorenzo Robledo Garcia.

William F. Kachergus, Jacksonville, Fla., for Hernan Ahumada.

Steven R. Heller, Jacksonville, Fla., for Jose Ayola.

William T. Lassiter, Jr., Jacksonville, Fla., for Rafael Barrio.

Daniel D. Richardson, Jacksonville, Fla., for Victor Bolano.

David R. Fletcher, Jacksonville, Fla., for Celso Rene Sanchez, a/k/a Raul Brito.

H. Randolph Fallin, Jacksonville, Fla., for Damis Caicedo.

Robert W. Elrod, Jacksonville, Fla., for Marciliano Caicedo.

Stephen H. Donohoe, Jacksonville, Fla., for Egidio Cordoba.

Edward W. Dawkins, Jacksonville, Fla., for Jairo Longaray.

Peter J. Fryefield, Jacksonville, Fla., for Eduardo Deluque.

Archibald J. Thomas, III, Federal Public Defender, for Ramon Midena.

Raymond E. Makowski, Jacksonville, Fla., for Jairo Nagupe.

Earl M. Johnson, Jacksonville, Fla., for Carlos Ortiz.

Christopher W. Gardner, Jacksonville, Fla., for Jorge Salas de la Osso.

Jeffry A. Mulrain, Jacksonville, Fla., for Libio Peralta.

Donald W. Matthews, Jacksonville, Fla., for Alejandro Pineda.

Gregory W. Johnson, Jacksonville, Fla., for Enrique Salas.

Moses Meide, Jr., Jacksonville, Fla., for Luis Vergaro.

Reese Marshall, Jacksonville, Fla., for Enrique Yabur.

Lester Makofka, Jacksonville, Fla., for Manuel Yabur.

## ORDER

CARR, District Judge.

The Court has for consideration the motions to suppress physical evidence related to the boarding and seizure of the MEREGHAN II (hereinafter referred to as the HEIDI). The motions to suppress have been filed by the following Defendants: PURCELL, KNOWLES, POOL, AHUMADA, SANCHEZ, E. CAIDEDO, CORDOBA, MEDINA, NAGUPE, SALAS, and M. YABUR. The motions have also been adopted by certain other defendants.

All thirty-one of the Defendants have been charged with both conspiracy to import marijuana and with conspiracy to possess marijuana with intent to distribute. Eight of the Defendants were allegedly involved in the conspiracy as it developed in the United States. The remaining twenty-three Defendants were allegedly involved in the conspiracy in Colombia and aboard the HEIDI at sea. The eight alleged conspirators who were in the United States will hereinafter be referred to collectively as the land-based conspirators (PETRULLA, TANNHAUSER, PURCELL, KNOWLES, LOYE, ALLEN, LEASK, and POOL) and the remaining twenty-three Defendants aboard the HEIDI will hereinafter be referred to collectively as the ocean-based conspirators. John Doe, a/k/a: BRADLEY, is not presently a party at trial.

On October 3, 5, and 6, 1978, the Court held a hearing on the Defendants' motions to suppress physical evidence. The Court is of the opinion this Order should be considered as findings of fact for the purpose of Rule 12(e), F.R.Cr.P.

The issues presented by the Defendants' motions and the government's opposition to it can be separated into three distinct groups: 1) the Defendants' standing to challenge the alleged illegal search and seizure; 2) the legality of boarding and seizure of the HEIDI if considered as administrative boarding by the United States Coast Guard; 3) the legality of the boarding and seizure of the HEIDI if considered from a probable cause perspective.

## FACTUAL BACKGROUND

The basic facts surrounding the motions involve the seizure of the HEIDI in international waters approximately three hundred and fifty miles off the coast of Florida. Commencing in July and continuing through the early part of August, 1978, the Drug Enforcement Administration (hereinafter referred to as DEA) had participated in an undercover capacity with the planning and assisting of certain of the Defendants with a planned off-loading of marijuana from a mothership off the coast of St. Augustine, Florida. DEA agents Weed and Story had the responsibility of finding and retaining off-loading vessels to bring the marijuana back to the United States. The alleged land-based conspirators had furnished the DEA agents with information regarding the description of the vessel which would be bringing the marijuana from Colombia and the planned coordinates of the rendezvous.

The United States Coast Guard was alerted by the DEA as to the description of the vessel and the point of rendezvous. On August 5, 1978, a United States Customs aircraft spotted a vessel fitting the description supplied by DEA to the Coast Guard. The Coast Guard was informed of the sighting and dispatched the cutter Cape Knox to surveil the suspect vessel. The surveillance continued for two days and the Cape Knox with the assistance of buoy tender Sagebrush boarded the vessel which was named the HEIDI on August 8, 1978.

## STANDING

██ It is well settled that a defendant must have standing to assert a challenge to an alleged illegal search.

Generally, a defendant will satisfy standing requirements (1) if he has a proprietary or possessory interest in the place searched or the object seized adequate to give rise to a reasonable expectation of privacy, (2) if he was on the premises at

the time of the contested search and seizure, or (3) if he is charged with an offense that includes as an essential element, possession of seized evidence. *United States v. Dyar*, 574 F.2d 1385, 1390 (5th Cir. 1978).

In the instant case, the Defendants seek to suppress the vessel HEIDI, the marijuana found aboard the HEIDI, and all charts, documents, radios, and other physical items found aboard the HEIDI.

The alleged ocean-based conspirators aboard the HEIDI quite obviously have standing to contest the search and seizure by the Coast Guard in light of the fact that they were on the premises at the time of the search and seizure. On the other hand, none of the alleged land-based conspirators was aboard the HEIDI, or has asserted a possessory or proprietory interest in the items seized. Finally, it is evident from a reading of the indictment that possession of the items sought to be suppressed is not an essential element of the offenses charged (i. e., conspiracy to possess and conspiracy to import marijuana). Even though the alleged land-based conspirators do not come within the ambit of the elements set forth in *Dyar*, those eight defendants argue constructive standing based on the fact that they are charged in the same conspiracy with certain of the possessing parties. After a thorough review of the law of standing in this area, the Court has found no authority for such a proposition. Accordingly, the Court is of the opinion that the alleged land-based conspirators identified previously are without standing to challenge the alleged illegal search of the HEIDI. The remaining twenty-three defendants aboard the HEIDI have standing to challenge the alleged illegal seizure.

## ADMINISTRATIVE BOARDING

[2] The evidence adduced at the hearing showed that the United States Coast Guard Officers who surveilled the HEIDI for more than two days never saw the vessel flying a flag of any nation. The HEIDI had the home port of Williamsted, Netherland Antilles written on the vessel. On August 6, 1978, the Commander of the cutter, Cape Knox, (Lieutenant Centonzi) radioed the vessel HEIDI and inquired about certain matters. The Commander asked the name of the vessel, the home port, the cargo, the radio call sign, the number of people on board, the last port of call, the next port of call. An individual who spoke in English replied that the name of the vessel was the HEIDI, the home port was Williamsted, Netherland Antilles, that the cargo was hi-fi equipment and spices, that the call sign was 2PQE1, that there were 12 people on board, that the last port of call was Colon, Panama, and the next port of call was Hamilton, Bermuda. The next day, August 7, 1978, Lieutenant Centonzi radioed the HEIDI again and requested the same information and, additionally, the name of the HEIDI's agent. The HEIDI responded with the name of an agent in Panama and gave the same response to the questions of the previous day with the exception that the next port of call was unknown. The cutter Cape Knox relayed this information to the Coast Guard's operation center in Miami. The Coast Guard then requested the United States State Department to confirm whether the vessel was of Netherland Antilles registry as indicated by the HEIDI or was of United Kingdom registry because of the call sign. The Coast Guard also requested confirmation of whether the agent in Panama could verify the information given by the HEIDI. The information which the Coast Guard received was that the HEIDI was neither registered in the United Kingdom nor in the Netherland Antilles, and that there was not an agent in Colon, Panama of the same name as that given by the HEIDI. From this information, the Commandant of the Coast Guard determined that the vessel HEIDI was a stateless vessel and could be boarded for determination of its documentation and registry.

The Defendants contend that the boarding of the HEIDI was in violation of Article 22 of the Convention on the High Seas (hereinafter referred to as CHS). Article 22, Section 1 proscribes the boarding of a foreign merchant ship on the high seas unless there is reasonable ground for suspecting,

1. . . .

   a) That the ship is engaged in piracy; or

   b) That the ship is engaged in the slave trade; or

   c) That, though flying a foreign flag or refusing to show its flag, the ship is, in reality, of the same nationality as the warship.

2. In the cases provided for in sub-paragraphs a), b) and c) above, the warship may proceed to verify the ships right to fly its flag. To this end, it may send a boat under command of an officer to the suspected ship. If suspicion remains after the documents have been checked, it may proceed to a further examination on board the ship, which must be carried out with all possible consideration.

The evidence at the hearing indicates that the Coast Guard did not have reasonable ground for suspicion as to Article 22(1)(a) and (b), but did with regard to (c). The evidence of this reasonable suspicion, although more fully delineated in the probable cause section of this Order, relates basically to the collective knowledge of the Coast Guard and DEA that there was a nexus between the vessel and a group of Americans involved in a conspiracy to import marijuana, that the vessel was made in the United States during World War II, and that the crew was attempting to mislead the Coast Guard as to the true nationality of the vessel. The Court places most significance on the fact that the crew deliberately attempted to mislead the Coast Guard which would have had plenary jurisdiction over the vessel had it been flying an American flag. *U. S. v. Warren*, 578 F.2d 1058 (5th Cir. 1978). Accordingly, the Court is of the opinion that if the CHS applies in the present case, that the boarding by the Coast Guard was in conformity with CHS Article 22, Section 1(c) and 2.

Although the Court has found that the CHS would permit the boarding of the HEIDI in the instant context, the Court is of the opinion that an equally compelling argument would reason that the CHS was not applicable because the vessel HEIDI was determined to be stateless. Article 5 of the CHS states:

1. Each State shall fix the conditions for the grant of its nationality to ships, for the registration of ships in its territory, and for the right to fly its flag. Ships have the nationality of the State whose flag they are entitled to fly. There must exist a genuine link between the State and the ship; in particular, the State must effectively exercise its jurisdiction and control in administrative, technical, and social matters over ships flying its flag.

2. Each State shall issue to ships to which it has granted the right to fly its flag documents to that effect.

Article 6 of the CHS states in part:

1. Ships shall sail under the flag of one State only . . . on the high seas.

2. A ship which sails under the flags of two or more States, . . . may be assimilated to a ship without nationality.

Consideration of Sections 5 and 6 in particular, and the CHS as a whole, reveals that the convention was an agreement among nations that the high seas would be open to vessels of all nations. The CHS establishes that vessels of each nation should be registered and documentation of that registration should be issued to indicate nationality. Thus, the basic premise is that in order to maintain the freedom of the seas each nation must provide registration so that it can exercise control and supervision over its vessels. Upon registration in a particular nation, the vessel bearing documentation of that registration can only be boarded by that nation or upon permission from that nation except if the vessel is in the territorial waters of another nation.

In the instant case, the United States Coast Guard used the available objective criteria to determine the nationality of the vessel, HEIDI. It inquired of the HEIDI as to nationality; it viewed the name of the home port on the vessel; it made inquiries with the State Department regarding the registry of the vessel in the United Kingdom or the Netherland Antilles; and it attempted to verify the infor-

mation supplied by the HEIDI through its alleged agent. From the information which the Coast Guard received, they reached the conclusion that the HEIDI was a stateless vessel. From the information available and inquiries made, the Court is of the opinion that the conclusion that the vessel was stateless was a reasonable one. Having concluded that the vessel was stateless, the Court is of the opinion that further consideration of the CHS which applies to the vessels of individual nations is unnecessary. Although the statute restricts the law enforcement authority of the Coast Guard to those instances in which the vessel is "subject to the jurisdiction, or to the operation of any law, of the United States," the Court is of the opinion that the Coast Guard pursuant to 14 U.S.C. § 89 has jurisdiction to determine whether it, in fact, has jurisdiction. In order for the Coast Guard to determine whether it has jurisdiction it must ascertain whether the vessel is of American registry. This inquiry can in a normal instance be determined without the necessity of boarding by inquiry of the vessel and verification of the information with the nation of registry. If the information from the vessel is not verified by the nation of registry and there then becomes a genuine question of registry of the vessel, 14 U.S.C. § 89 would permit the United States Coast Guard to board the vessel and determine whether it was in reality a United States vessel.[1] Accordingly, the Court is of the opinion that 14 U.S.C. § 89(a) permits the boarding of stateless vessels to determine nationality. *U. S. v. Victorson,* No. Cr. 78123V (W.D. August 21, 1978); *U. S. v. Torres,* No. 78–8019 Cr. CA (S.D.Fla., July 10, 1978); *U. S. v. Albernez,* No. 77–70 Cr. CA (S.D.Fla., March 24, 1977); *contra U. S. v. Cortez,* No. 78–56 Cr. SMA (S.D.Fla., April 10, 1978).

1. If the United States Coast Guard did not have this authority, vessels which were determined to be stateless by all the available criteria, exclusive of boarding, would be permitted to roam the oceans with impunity without any nation being able to determine which nation, in fact, could exercise control over the vessel. Thus, each stateless vessel would be elevated to national status. Such is certainly not the import of the CHS or any other principal of

## PROBABLE CAUSE

■■ In addition to the jurisdiction to determine the nationality of stateless vessels which is granted by 14 U.S.C. § 89(a), the Court is also of the opinion that § 89 permits the Coast Guard to board a vessel of undetermined nationality if it has probable cause to believe that the vessel or its crew is violating the laws of the United States. The evidence adduced at the hearing indicates that the United States Coast Guard had probable cause to believe that the vessel HEIDI was the vessel which the alleged land-based conspirators were expecting. Prior to the boarding of the HEIDI, the DEA agents had been given the coordinates and dates of the planned rendezvous and a description of vessel to be used, including the length, color, name, and configuration. The DEA agents also knew that the vessel was in the general Florida area because one of the alleged conspirators, Petrulla, had informed the DEA agents that the vessel was 150 miles south of the off-load site.

Lieutenant Centonzi aboard the cutter Cape Knox had spotted a white plastic bag floating in the ocean directly behind the HEIDI on the morning of August 6, 1978. At the time, the Cape Knox was only 1,000 yards astern of the HEIDI. The bag, which had Spanish writing on the outside, contained approximately two pounds of dry vegetable material which when field tested was determined to be marijuana. The bag which was not closed at the top had apparently been in the ocean a very short time because the seas that day were one to two feet and the winds were 15 to 20 knots. Lieutenant Centonzi also testified that there were no other vessels in sight at the time of the pickup of the bag containing marijuana and the visibility was limited only by the horizon (14 miles).

international law. In fact, the right of approach to determine nationality has long been recognized. Boarding to determine nationality after a finding of statelessness is essential because the information most likely to definitively determine the issue of nationality would be aboard the vessel (documents of registration, quarantine notices, written customs notices or duties paid, cargo manifests, or the main beam number).

The false information supplied by the HEIDI regarding nationality, agent, the presence of the captain, and future ports of call, plus the erratic course of the vessel all contributed to the probable cause that the vessel was the one which DEA had been searching. With the exception of the name of the vessel for which the alleged land-based conspirators asserted was the "American Merchant", all the other information supplied by the conspirators was matched to the HEIDI.

Once aboard the vessel, the search which was conducted by Ensign McGlone was reasonable in all respects in that it was a search designed to find any available documentation of the vessel HEIDI for purposes of determining nationality. Also, the search was consensual in that the individual who presented himself to Ensign McGlone as being in charge of the HEIDI, Manuel Ospina, consented to the search at each juncture.

After searching the bridge and the two cabins directly adjacent to it, McGlone asked Ospina to take him to the Captain's cabin so that he could search that room for documents. Upon leaving the bridge and descending the stairs nearby on the way to the Captain's quarters, Ensign McGlone noticed the smell of marijuana. Upon McGlone's request, a food locker from which the smell of marijuana emanated was opened by Ospina and found to contain a large quantity of marijuana. Further search revealed that the vessel was carrying in excess of 100 tons of marijuana.

■ The evidence presented by the Government clearly indicates that there was probable cause for the boarding of the vessel HEIDI. Once aboard the HEIDI the odor of marijuana provided the probable cause to arrest the crew of the vessel. *U. S. v. Barnard*, 553 F.2d 389, 391 (5th Cir. 1977).

■ Although the Defendants contest the jurisdiction over the offense in light of the fact that the boarding of the HEIDI was made in international waters, the Court is of the opinion that there is jurisdiction because 14 U.S.C. § 89(a) premises boarding on the "operation of any law, of the United States." At the time the vessel was boarded, the Coast Guard had probable cause that the vessel HEIDI was violating the conspiracy laws of the United States regarding the importation of marijuana. Also, the fact that the United States subscribes to the objective view of the territorial principle of jurisdiction leaves little doubt in the Court's opinion but that jurisdiction over the individuals and offense is present. *U. S. v. Winter*, 509 F.2d 975 (5th Cir. 1975); *Rivard v. U. S.*, 375 F.2d 882 (5th Cir.) *cert. den. sub. nom., Groleau v. U. S.*, 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d 181 (1967); *Ker v. Illinois*, 119 U.S. 436, 78 S.Ct. 225, 30 L.Ed. 421 (1886); *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952).

Based on the above findings, the Court is of the opinion that each and every of the motions to suppress physical evidence related to the boarding, search, and seizure of the HEIDI is DENIED.