865 F.2d 259
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Leo H. MILLER and Agnes J. Miller, Plaintiffs-Appellants,
v.
Laurence KUNZE, et al., Defendants-Appellees.
 No. 86-1776.
 United States Court of Appeals, Sixth Circuit.
 Dec. 28, 1988.
 
 Before BOYCE F. MARTIN, Jr. and BOGGS, Circuit Judges and THOMAS A. WISEMAN, Jr., Chief District Judge.*
 PER CURIAM.
 
 
 1
 Plaintiffs, Leo and Agnes Miller, filed this civil rights action under 42 U.S.C. Sec. 1983 against the County and City of Alpena and various Michigan officials. The Millers alleged that the defendants violated the Fourth, Fifth and Fourteenth Amendments to the Constitution by damaging their rental property in the course of ending a confrontation with an armed tenant, and by refusing to allow them to make repairs to the fire-damaged structure. The district court ruled in favor of the defendants on all claims raised, and the Millers now appeal. For the reasons discussed below, we affirm.
 
 
 2
 * Plaintiffs own a parcel of land in Alpena, Michigan, on which was located a house and an accessory building that contained the Millers' upholstery business and served as their living quarters. In May 1980, the Millers leased the house, which they used as a rental property to Norbert and Gwendolyn Skiera. During the early morning hours of August 2, 1980, Officers Chalton, Wiser and Ludwiczak of the Alpena Police Department received a call that a domestic dispute was occurring at the residence of Norbert and Gwendolyn Skiera. When the officers arrived, Norbert Skiera burst from the house and, leveling a loaded shotgun at Officer Wiser, threatened to shoot the officers if they did not leave the property. After retreating some distance, the officers were able to defuse the situation by convincing Norbert to allow his wife to leave the house. The police then escorted Gwendolyn to a local motel where she remained until the next morning. While traveling to the motel, Gwendolyn advised the officers that her husband had other weapons with ammunition in the house. She also stated that her husband became violent when he was intoxicated, that he had been drinking since early morning, and that he had threatened her life.
 
 
 3
 Later that morning, Gwendolyn returned home to retrieve some of her clothing. When she emerged from the house, she met her husband, who was pulling into the driveway. She immediately ran to a neighbor's house, and a short time later Norbert came after her carrying a gun. The Skieras became embroiled in a heated argument, during which he demanded and received money from his wife. Norbert left the neighbor's house, but he returned on two more occasions, still holding the gun, to make additional demands on his wife. When he was refused entry on the third visit, he pounded on the door until he broke it. Frightened, the neighbors telephoned the Alpena Police Department and they responded to the call at about 3:40 p.m.
 
 
 4
 Norbert returned home before Officers Bell and Chalton arrived in separate patrol cars. When Officer Bell pulled into the Skiera driveway, he was fully aware of Norbert's prior threats against police earlier that morning, having read the police report and spoken with one of the officers on the scene. After briefly conferring with Gwendolyn, the officers returned to the Skiera house and requested that Norbert come out. Using profane language, Norbert refused to do so and threatened to kill the officers if they did not remove their vehicles from the driveway. The officers pulled their vehicles away from the house, and Officer Chalton proceeded to the police station to secure an arrest warrant for Norbert for the felonious assault on Officer Wiser earlier that day. In the meantime, Officer Bell requested further assistance and maintained surveillance of the house from behind his police car. A short time later, Chalton returned with verbal authorization from a state's attorney for the warrant, and Bell notified Skiera over the public address system of his vehicle that a warrant had been issued for his arrest.
 
 
 5
 Police Chief Kunze arrived with reinforcements at about 5:30 p.m. and took command of the situation. Several officers were instructed to take positions around the house, while others set up a security perimeter, keeping away the neighbors and other curious spectators. During the next several hours, police attempted to negotiate with Norbert Skiera to leave the house unarmed, but each time he refused. As time passed, Skiera became increasingly loud, profane and belligerant. He repeatedly screamed threats at the officers, informing them of his intention to use his weapons to kill those outside. According to Officer Anderson, on one occasion Norbert screamed, "I have an 1100 automatic and I'm coming out and I'll take you with me. And I'll take three or four of you. I'll blow your fucking heads off." Officer Soldenski recalled hearing Norbert say "to the effect that he had loaded guns in the house, to stay away, 'You may take me but I'll take a few cops with me.' "
 
 
 6
 During the confrontation, the police found the plaintiffs taking cover in the accessory building. They were evacuated to safety. After some six hours of unsuccessful negotiations, and with the approach of darkness, the police decided to use tear gas to bring Norbert from the house. Before doing so, they notified Norbert that tear gas would be used if he did not surrender in five minutes. According to Officer Male, Norbert responded that "if we tear-gassed, he was going to come out and take a couple of cops with him." After waiting ten minutes, Chief Kunze ordered tear gas to be fired into the house. The first barrage occurred close to 9:00 p.m. and had little effect. Norbert remained in the house and continued to scream obscenities an threaten police. A second volley of tear gas was ordered at 10:15 p.m.
 
 
 7
 After the second round, a fire developed in the front bedroom of the house. Police heard Norbert scream for help, but when they offered assistance he continued his threats and profanity. At approximately 10:30 p.m., Chief Kunze ordered fire officials summoned to the scene to enter the dwelling to extinguish the blaze. Several police officers accompanied them for protection. When they entered, the officers discovered Norbert Skiera lying dead in the hallway, an apparent victim of smoke inhalation.
 
 
 8
 The damage to the Miller house was extensive. On August 8, 1980, Larry Rettell, Building Inspector for the City of Alpena, informed the plaintiffs "once more" that they were residing in the accessory building in violation of the City's zoning ordinance which prohibited two residences on one lot. The letter continued.
 
 
 9
 Because of the violation that exists on the premises and that it is illegal to have two residences on one lot, a building permit for the reconstruction and repair of the fire damaged residence will not be issued until such time as the rear residence has completely been abandoned and returned to its original permitted use of an accessory building.
 
 
 10
 On April 28, 1981, the City's attorney notified the Millers that once the necessary building was vacated and the bathroom facilities were removed, making it uninhabitable for residential purposes, a permit would be issued to repair the fire-damaged house. After a brief time in Florida, however, the Millers moved back into the accessory building. They notified the City that they intended to live there until the house was repaired, at which time they would vacate the accessory building and no longer use it for residential purposes. On June 15, 1982, the City attorney demanded that the Millers demolish the house or face a future condemnation action.[1]
 
 
 11
 On August 2, 1982, the Millers filed the present action in district court against the County and City of Alpena, the law enforcement officers participating in the Skiera confrontation, and Building Inspector Rettell. They alleged that their home was damaged extensively and thus unreasonably "seized" during the police confrontation with Skiera, and that the dwelling continued to be unreasonably "seized" by the City's refusal to allow them to repair it, in violation of the Fourth Amendment. They also asserted that the destruction of their home was a "taking" without just compensation in violation of the Fifth Amendment, and was a deprivation of property without due process of law in violation of the Fourteenth Amendment. Finally, the Millers alleged that the actions of the police officers and Building Inspector Rettell were "shockingly unjustified" in violation of substantive due process. After the parties engaged in discovery, the district court granted the defendants' motions for summary judgment on all the claims except the Fifth Amendment claim. The court ruled that the just compensation claim was not ripe for review, and granted the defendants' motion to dismiss
 
 II
 
 12
 At the outset, we set forth the standard for reviewing the district court's decisions. Since we are concerned primarily with motions for summary judgment, our review is de novo: we must determine whether there is a genuine issue of material fact, viewing the evidence in the light most favorable to the non-moving parties, and whether the moving parties are entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. We may not weigh the evidence, assess the credibility of witnesses or determine the truth of the matter at issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The movants have the initial burden of identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which they believe demonstrate the absence of a genuine issue of material fact, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). They need not support their motion with affidavits or other similar materials negating the nonmovants' claims, Ibid. Once the movants have met their initial burden, the nonmoving parties must go beyond the pleadings and by their own affidavits, or by the depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue for trial, Id. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." Id. at 322.[2]
 
 III
 
 13
 We first address the plaintiffs' Fourth Amendment claim. The district court, in rejecting this claim, ruled that the Millers' home was not "seized" within the meaning of the Fourth Amendment. Plaintiffs argue that a "seizure" did in fact occur because their possessory interest in the property was "interfered with in a meaningful manner." They state, "[n]ot only was the property seized for a long period of time and extensively damaged, but the Defendant City of Alpena then continued their seizure of the property by not allowing [them] to repair or reconstruct the property and put it to good use."
 
 
 14
 We have considerable doubt about the lower court's conclusion that a "seizure" in the constitutional sense does not occur when police officers surround a house, fire tear gas in it, and ultimately cause a fire to burn inside. The district court's reasoning appears to be inconsistent with the view that "a 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interest in that property," United States v. Jacobsen, 466 U.S. 109, 113 (1984) (footnote omitted).[3] However, we need not decide this issue definitively, because there is an alternative basis for affirming the district court. We conclude that the plaintiffs lack standing to raise a Fourth Amendment claim.[4] They have the burden of satisfying a two-part test: 1) whether they manifested a subjective expectation of privacy in the premises searched or the thing seized; and 2) whether society is prepared to recognize that expectation as legitimate. California v. Ciraolo, 476 U.S. 207, 211 (1986); Rakas v. Illinois, 439 U.S. 128, 140 (1978). Fourth Amendment rights are personal and may not be asserted vicariously, Rakas, 439 U.S. at 133-34.
 
 
 15
 Although the plaintiffs owned the fire-damaged house, that fact is insufficient to confer standing. "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end" of the inquiry. United States v. Salvucci, 448 U.S. 83, 92 (1980) (citation omitted). The Supreme Court has stated that Fourth Amendment standing analysis should not turn on "arcane distinctions developed in property and tort law.' " Id. at 91 (quoting Rakas, 439 U.S. at 143).
 
 
 16
 The plaintiffs have failed to establish that they had a reasonable expectation of privacy that was violated by the intrusion in this case. Although the Millers owned the house in question, they abandoned any expectation of privacy therein by renting the dwelling to the Skieras. When the police confrontation occurred, the Millers did not live in the house, but instead resided in the accessory building containing their upholstery shop. There is no evidence that they had any connection with the house other than as the landlord. Indeed, it was conceded that whatever property the Millers owned in the house was there for the benefit of the tenants. Accordingly, we rule that the plaintiffs lack standing to raise the Fourth Amendment claim. See United States v. Nunn, 525 F.2d 958, 959 (5th Cir.1976) (owner of truck who was not driving at the time of its seizure had no Fourth Amendment standing because he lacked a reasonable expectation of privacy in the vehicle). See also United States v. Dyar, 574 F.2d 1385, 1390 (5th Cir.), cert. denied, 439 U.S. 982 (1978) (defendants with leasehold interest in aircraft lacked standing to challenge search where they gave possession of the vehicle to another individual).
 
 
 17
 Even if we were to conclude that plaintiffs had standing, we believe that the plaintiffs' monetary loss occasioned by the police officers' legitimate efforts to ensure public safety should be redressed through appropriate state tort and common-law remedies or, if these are inadequate, under the Fifth Amendment or the due process clause, rather than the Fourth Amendment. See Hudson v. Palmer, 468 U.S. 517, 540 (1984) (O'Connor, J., concurring). Accordingly, we turn to the plaintiffs' remaining claims.
 
 IV
 
 18
 The Millers contend that the police effected a "taking" of property without just compensation under the Fifth Amendment, which applies against the states under the Fourteenth Amendment, and that the "taking" continued by virtue of the City's refusal to permit them to make repairs to their house. Relying on Williamson County regional Planning Commission v. Hamilton Bank of Johnson City, 473 U.S. 172 (1985), the district court ruled that this claim was not ripe for review because the plaintiffs had not first resorted to state inverse condemnation proceedings. We agree.
 
 
 19
 In Williamson County, the Supreme Court made clear that a plaintiff alleging a Fifth Amendment violation must first seek compensation under available state procedures before bringing a claim for an unconstitutional taking in federal court. "[I]f a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation," Id. at 195. Accord, First English Evangelical Lutheran Church of Glendale v. City of Los Angeles, --- U.S. ----, 107 S.Ct. 1278, 2384 n. 6 (1987); Four Seasons Apartments v. City of Mayfield Heights, 775 F.2d 150 (6th Cir.1985). According to the Court,
 
 
 20
 Because the Fifth Amendment proscribes taking without just compensation, no constitutional violation occurs until just compensation has been denied. The nature of the constitutional right therefore requires that a property owner utilize procedures for obtaining compensation before bringing a Sec. 1983 action.
 
 
 21
 Williamson County, 473 U.S. at 194 n. 13 (emphasis in original). Indeed, resort to adequate state procedures may negate the need for federal court litigation because "what [states] take with one hand they may give back with the other. "MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 349 (1986). Thus, a federal court cannot "determine whether a municipality has failed to provide 'just compensation' until it knows what, if any, compensation the responsible administrative body intends to provide," Id. at 348-49.
 
 
 22
 The plaintiffs have not availed themselves of the state's inverse condemnation procedures in an effort to recover just compensation for the alleged government takings in this case. Nor do they claim that these procedures are inadequate. See Hart v. Detroit, 416 Mich. 488, 331 N.W.2d 438 (1982) (recognizing an action for inverse condemnation). Nevertheless, plaintiffs argue that the Williamson County requirement that they must first pursue state procedures is inapplicable because that case, like Parratt v. Taylor, 451 U.S. 527 (1981), only addressed random and unauthorized acts, while the police officers' actions in this case were pursuant to established state policy or procedure. We reject this argument. Not only has the Supreme Court never made such a distinction in the Fifth Amendment area, but the Williamson County Court indicated that resort to state procedures applied in cases where the deprivation of property was pursuant to established state policy or procedure. See Williamson County, 473 U.S. at 195 n. 14. Since Michigan provides an adequate and available means of addressing the Millers' unjust compensation claim, we rule that the district court properly dismissed this aspect of plaintiffs' suit. Four Seasons Apartment, 775 F.2d at 151-52.
 
 
 23
 The Millers claim that the police officers deprived them of their property without procedural due process of law. The district court ruled that there was no due process violation, because the loss here was the result of random acts, and because postdeprivation remedies provided by state law were adequate. We similarly rule that the plaintiffs' procedural due process claim must fail, but we do so for slightly different reasons.
 
 
 24
 In Parratt v. Taylor, 451 U.S. 527 (1981), the Supreme Court ruled that when a state deprives a protected interest through a "random and unauthorized act," there is no due process violation where the state provides an adequate postdeprivation remedy.[5] The Court reasoned as follows:
 
 
 25
 The justifications which we have found sufficient to uphold takings of property without any predeprivation process are applicable to a situation such as the present one involving a tortious loss of a prisoner's property as a result of a random and unauthorized act by a state employee. In such a case, the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive how the State could provide a meaningful hearing before the deprivation takes place.
 
 
 26
 Id. at 541. However, as the Court made clear in Logan v. Zimmerman Brush Co., 455 U.S. 422, 436 (1982), Parratt "does not apply to a case where a plaintiff is deprived of property under an 'established state procedure' without adequate predeprivation procedural safeguards, "Wilson v. Beebe, 770 F.2d 578, 583 (6th Cir.1985) (en banc). "This is a logical limitation of Parratt v. Taylor because, where the action is taken pursuant to such established procedures, there is an opportunity to provide procedural process before the act occurs." Ibid. The "controlling inquiry" in determining the applicability of Parratt "is solely whether the state is in a position to provide for predeprivation process." Hudson v. Palmer, 468 U.S. 517, 534 (1984). See also Vinson v. Campbell County Fiscal Court, 820 F.2d 194, 199 (6th Cir.1987) (and cases cited therein).
 
 
 27
 Plaintiffs contend that Parratt is inapplicable because the police acted pursuant to established state procedure. However, plaintiffs have failed to set forth any facts from which a jury could conclude that "established state procedure effected a deprivation." Vinson, 820 F.2d at 199. See Davis v. Robbs, 794 F.2d 1129, 1131 (6th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 592 (1986).[6] Moreover, this is a case where the state "was in no position to provide predeprivation process ..." Vinson, 820 F.2d at 199. The state could not have provided a predeprivation hearing before firing tear gas into the house; the need for quick action in response to a violent gunman hiding the the Millers' home precluded it. See Augustine v. Doe, 740 F.2d 322, 327 (5th Cir.1984) ("If the state cannot protect the individual by imposing predeprivation procedures, or if quick action is essential, the best the state can do is to allow injured individuals to recover the damages after the injury has occurred." (emphasis added). There simply was no time to provide the plaintiffs with a hearing before the deprivation occurred in this case, and therefore the State was not under any compulsion to do so.
 
 
 28
 The only question remaining is whether Michigan's postdeprivation remedy is adequate. Plaintiffs have failed to plead and prove that Michigan does not provide an adequate remedy. Sproul v. City of Wooster, 770 F.2d 578, 584 (6th Cir.1985) (en banc). Accordingly, the district court did not err in ruling in favor of the defendants on the plaintiffs' procedural due process claim.
 
 VI
 
 29
 The Millers contend that the police officers' conduct during the Skiera confrontation, and Building Inspector Rettell's decision to deny a building permit for the fire-damaged house, were "shockingly unjustified" and constituted gross abuse of power. The District court rejected this substantive due process claim, concluding that "there is no action here as far as property is concerned, that constitutes a shocking of the conscience or an abuse of power." We agree.
 
 
 30
 This court has recognized that a substantive due process claim may be maintained under 42 U.S.C. Sec. 1983, but the violation must result from an egregious abuse of governmental power. Nishiyama v. Dickson County, 814 F.2d 578, 583 (6th Cir.1985) (relying on Rochin v. California, 342 U.S. 165 (1952)).
 
 
 31
 In determining if a police officer's conduct rises to a level of a constitutional depreivation, factors such as the need for the force, the relationship between the need and the amount applied, the extent of the injury inflicted, and the motivation of the police officer in applying the force must be considered.
 
 
 32
 Lewis v. Downs, 774 F.2d 711, 713 (6th Cir.1985) (citing Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert denied, 414 U.S. 1033 (1973)). When examining the "circumstances surrounding the use of force," we must guard against "unrealistic post hoc evaluations." Id. at 713-14 (emphasis in original).
 
 
 33
 In our view, none of the Michigan officials' actions in this case constituted an egregious abuse of governmental power sufficient to state a substantive due process claim.[7] It may seem a "Catch-22" that plaintiffs could not rebuild there uninhabitable house without vacating the only useable habitation on their property. However, plaintiffs have failed to show that the decision to deny them a building permit to rebuild the fire-damaged house was in any way inconsistent with statutory authority. Whatever our policy views on the zoning laws in question, substantive due process does not permit us to enforce our conception of wise or humane policy on local officials. Nor have plaintiffs provided even a hint of factual support for the conclusion that Rettell was motivated by malice or that he intentionally abused his position in order injure them. See Vinson v. Campbell County Fiscal Court, 820 F.2d 194, 198 (6th Cir.1987).
 
 
 34
 We also conclude that the district court did not err in concluding that the police officers' conduct in this case did not constitute an egregious abuse of power. The police were responding to a life-threatening situation. They were facing a heavily armed and intoxicated gunman who threatened repeatedly to kill the officers if they sought to remove him from the house. After many hours of unsuccessful negotiations with Norbert Skiera, and with the approach of darkness, the police decided that tear gas would be the best means to defuse the situation and bring him out, while protecting public safety. Unfortunately, the tear gas caused a fire to erupt, killing Skiera and ultimately damaging the house. But, there have been no facts put forth that the officers on the scene intended to cause a fire in the dwelling or to do anymore than merely smoke out Skiera with the use of tear gas. Indeed, the record reveals that the police were rather concerned about the fire from its inception, ordering fire officials into the dwelling as soon as it was reasonably safe to do so. Accordingly, we conclude that the plaintiffs have failed to present sufficient facts in support of their substantive due process claim.
 
 VII
 
 35
 The foregoing discussion highlights an alternative basis for rejecting the plaintiffs' procedural and substantive due process arguments. The Supreme Court has held that the due process clause is not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty or property. Daniels v. Williams, 474 U.S. 327, 330-31 (1986). In order to prevail, the plaintiffs must show either intentional conduct or "gross negligence," which we have defined as "intentionally [doing] something unreasonable with disregard to a known risk or a risk so obvious that [the actor] must be assumed to have been aware of it, and of a magnitude such that it is highly probable that harm will follow." Nishiyama v. Dickson County, 814 F.2d 277, 282 (6th Cir.1987) (en banc).
 
 
 36
 As we have just noted, plaintiffs have failed to present any factual support for the conclusion that the police officers on the scene intended to ignite the house that Skiera was in. Although plaintiffs do allege in their complaint that the officers were "grossly negligent," we have held that "[n]egligence does not become 'gross' just by saying so" Jones v. Sherrill, 827 F.2d 1102, 1106 (6th Cir.1987). "If the courts are to make any sense of the distinction between gross negligence and simple negligence, we must ensure that gross negligence is something more than simple negligence 'with the addition of a vituperative epithet.' " Ibid. (quoting Wilson v. Brett, 11 M. & W. 113, 152 Eng.Rep. 737 (Ex 1843)). The plaintiffs have the burden of presenting the facts that "charge the government officials with outrageous conduct or arbitrary use of government power," Ibid.
 
 
 37
 We rule that the plaintiffs have failed to produce sufficient facts to enable a reasonable trier of fact to conclude that the officials here damaged their property intentionally or through gross negligence. Summary judgment is proper if the governing law permits only one reasonable conclusion as to the verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The documents produced in support of summary judgment compel only one conclusion, that at best the officers were merely negligent in their handling of the Skiera confrontation. This is insufficient to establish a claim under the due process clause.
 
 
 38
 We have reviewed the remaining contentions and, finding them to be without merit, the decisions of the district court are AFFIRMED.
 
 
 
 *
 The Honorable Thomas A. Wiseman, Jr., Chief United States Judge for the Middle District of Tennessee, sitting by designation
 
 
 [1]
 On November 1, 1982, the City of Alpena commenced a condemnation action in state court against the Millers, claiming the fire-damaged house was a public nuisance and should be demolished The complaint alleged that notices had been sent to the Millers requiring them either to repair the premises or to demolish it, and that the dangerous structure had been permitted to remain for such a length of time as to create a danger to the public. On February 11, 1983, the Circuit Court for the County of Alpena ruled that the fire-damaged house "constitutes a fire hazard, is an unsafe structure dangerous to the public health and welfare, and is substandard and generally a public nuisance" and therefore should be destroyed. The structure was subsequently razed by the City of Alpena in May 1983
 
 
 [2]
 When reviewing the defendants' motion to dismiss on the Fifth Amendment claim, we take the material allegations of the complaint as true and liberally construe the complaint in favor of the plaintiffs. Conley v. Gibson, 355 U.S. 41 (1957). The standard of review requires dismissal "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. at 45-46
 
 
 [3]
 We reject the Millers' contention that a "seizure" occurred when the City of Alpena denied their request for a building permit to reconstruct the fire-damaged home. Plaintiffs have failed to provide any case authority for such a novel position, and we do not believe there is any compelling reason to adopt such an expensive reading of the Fourth Amendment. The Takings Clause of the Constitution remains as an avenue for redress of deprivation of property if the City's zoning actions rise to that level
 
 
 [4]
 Although the district court never addressed the standing issue, we believe it is appropriate to do so here. The issue was raised below and, more importantly, "this is not a situation where the record is "virtually barren' of the facts necessary to decide the standing inquiry," United States v. Skowronski, 827 F.2d 1414, 1417 n. 2 (10th Cir.1987) (quoting Combs v. United States, 408 U.S. 224, 227 (1972) (per curiam)). The relevant facts that are dispositive of the standing inquiry are present in the record
 
 
 [5]
 The Supreme Court has overruled Parratt to the extent that it held that the due process clause is implicated by a negligent act of an official causing unintended loss of or injury to life, liberty or property, Daniels v. Williams, 474 U.S. 327, 330-31 (1986)
 
 
 [6]
 Plaintiffs' reliance on Sanders v. Kennedy, 794 F.2d 478 (9th Cir.1986), is misplaced. In Sanders, unlike the instant case, the Ninth Circuit was reviewing the district court's decision granting the defendants' motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P. Consequently, the court of appeals viewed all the allegations in the complaint as true, including the plaintiffs' contention that the defendants' acts were neither random nor unauthorized. Sanders, 794 F.2d at 482. The instant case by contrast, has proceeded to the summary judgment state, and the plaintiffs must do more than merely rely on their pleadings. As we state in the text, the plaintiffs have failed to meet their burden in support of their contention that Parratt v. Taylor is inapplicable
 
 
 [7]
 We shall assume without deciding that substantive due process applies to loss or injury to property