UNITED STATES of America,
Plaintiff-Appellee,

v.

Edward RODRIGUEZ, a/k/a Rick, Thomas J. Albernaz, Peter Smigowski, and William John Martins, Defendants-Appellants.

No. 77–5339.

United States Court of Appeals,
Fifth Circuit.

Nov. 14, 1978.

Rehearing En Banc Granted
Nov. 20, 1978.

Raymond E. LaPorte, Tampa, Fla., for Rodriguez.

Martin G. Weinberg, Boston, Mass., for Albernaz.

James W. Lawson, Joseph S. Oteri, Boston, Mass., for Smigowski.

Joel R. Magazine, Diane R. Tolbert, Coconut Grove, Fla., Jeanne Baker, Cambridge, Mass., for Martins.

Jack V. Eskenazi, U. S. Atty., Michael P. Sullivan, Asst. U. S. Atty., Miami, Fla., Mervyn Hamburg, Atty., U. S. Dept. of Justice, Washington, D. C., for United States.

Before SKELTON *, Senior Judge, and FAY and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The appellants challenge their convictions on both counts of a two count indictment charging conspiracy to import marijuana in violation of 21 U.S.C. § 952, and a conspiracy to distribute marijuana in violation of 21 U.S.C. § 841,[1] alleging that some twenty different errors were committed below. Their cavalcade of contentions marches against a background of dramatic events narrated by the government witnesses. A full panorama would be fitting material for a novelist but redundant to this opinion so we recount only so much as appears essential for decision.

### I.

During a lengthy intrigue conducted with various of the defendants, a special agent of the Drug Enforcement Administration ("DEA"), Theodore Weed, represented himself as being able to obtain a boat that could unload marijuana from a vessel at sea and transport it to Florida. He was to be paid $200,000 or ten percent of the value of the cargo, which was eventually represented to be 40,000 pounds. He was first approached by the defendant Albernaz. During the course of negotiations that ensued, he was introduced to defendants Rodriguez and Smigowski, as Albernaz's principals.

There were many meetings, complicated plans, and many conversations with Albernza and Rodriguez, some of which were tape recorded. Eventually, a place to unload the cargo was located on a Florida key south of Marathon.[2] Plans were made to meet the freighter that would bring the cargo, and Captain Jones, the captain of the Catchalot II, was enlisted. Captain Jones was secretly assisting the government.

Albernaz gave DEA agent McCutcheon and Captain Jones the final instructions, including the coordinates for a rendezvous with the freighter, and codes to be used when communicating with it. Albernaz stated that they were to unload 1,100 bales containing about 50 pounds each, and that there was an option for 300 more bales which could be obtained if a particular message were given the captain of the freighter. The Catchalot II left West Palm Beach the evening of January 27, with a crew secretly composed of DEA agents, Customs agents, and civilians. Albernaz and Rodriguez continued their efforts to arrange for delivery of the valuable cargo.

Two days later, the co-defendant William Martins chartered a Piper Navajo aircraft. Martins, Rodriguez and Albernaz, together with three pilots, flew on the plane from Fort Lauderdale to the Bahamas. Martins told one pilot, Jerry Harvey, that they were searching for a fishing boat which was in trouble. Due to darkness, the rendezvous of the vessels could not be completed, so the plane carrying Martins, Albernaz and Rodriguez returned to Fort Lauderdale. Harvey was paid $900 for the trip.

The next day, Martins again chartered Harvey's aircraft. Harvey flew Martins, Albernaz and Rodriguez over the freighter and the Catchalot II; messages were dropped to each indicating the location of the other vessel. The Catchalot II established itself as the pickup boat via the use

---

* Senior Judge of the United States Court of Claims, sitting by designation.

1. Conspiracy to violate § 952 is punishable under 21 U.S.C. § 963. Conspiracy to violate § 841 is punishable under 21 U.S.C. § 846.

2. The marijuana was transferred 30 miles east of Elbow Cay, outside of Abaco Island in the Bahamas, 200 to 225 miles east of the United States.

of the code disclosed by Albernaz. Captain Jones informed the captain of the freighter that he wanted "to offload" immediately. The captain of the freighter replied that he wanted to wait for dark, but eventually agreed to unload after asserting that he had never "offloaded" in daytime before. The Catchalot II tied up alongside the freighter and 150 bales of marijuana were unloaded pursuant to a careful count by the captain of the freighter and Captain Jones.

Ostensibly to stow the marijuana bales below deck, the Catchalot II moved away from the freighter, and then covertly called the Coast Guard. During the next few hours the Catchalot II maintained a distance from the freighter. The Coast Guard vessel Dauntless appeared on the scene at approximately 7:00 p. m.

Using both Spanish and English, the Coast Guard vessel ordered the freighter to stop. It did not respond and, after approximately 30 minutes, the Coast Guard fired three short bursts of a machine gun across its bow. It then fired three rounds from a canon. This caused the freighter to stop. Thirteen Colombian seamen aboard the freighter were arrested, and, although separately tried, were charged as co-conspirators with the appellants herein. The appeal from their convictions is separately reported. *United States v. Cadena,* 5 Cir. 1978, 585 F.2d 1252.

About the time these events were occurring, defendants Martins and Rodriguez were arrested in a Miami hotel room, and *Miranda*[3] warnings were given to them. Smigowski and Albernaz were arrested an hour later at the same hotel.

At DEA headquarters, Agent Fernandez discovered that Martins was only 18 and asked him how he got into trouble. In an emotional state, Martins replied that he would give his story but "he had to make a telephone call prior to talking . . .." Martins' parents had recently died so he called a family friend, Captain Bob Frost of the Hialeah Police Department, and asked his friend whether or not he should cooperate with the federal agents. Captain Frost asked Martins about the circumstances of the arrest; the young defendant indicated that he had gotten into a marijuana deal and that someone had given him $20,000. Captain Frost then advised Martins to cooperate with the agents. Martins became very upset; he said to Captain Frost that, if he did cooperate, he would be killed. After Frost advised Martins, Agent Fernandez got on the phone and promised Frost that, if Martins cooperated, the DEA would provide the Hialeah Police Department with helpful information. Martins then gave a statement that incriminated himself and some of the other defendants.

The defendants were each convicted of a conspiracy to import marijuana, 21 U.S.C. § 952 (Count I) and a conspiracy to distribute marijuana, 21 U.S.C. § 841, (Count II).[4] There was no distinction whatsoever between the allegations in the Count I conspiracy and the Count II conspiracy except that each count cited a different statutory section and a different objective. The overt acts charged and all the other recitals of the indictment in each count were identical. Appellants raise eleven common challenges to their convictions; Martins raises nine additional grounds, and Smigowski separately challenges the sufficiency of the evidence.

II.

Appellants raise an ingenious defense which they call jurisdictional entrapment.

---

3. *Miranda v. Arizona,* 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

4. Rodriguez was sentenced to imprisonment for four and one-half years on both counts, the sentences to be served consecutively. Albernaz was sentenced to imprisonment for three and one-half years (42 months) on each count, the sentences to be served consecutively. Smigowski was sentenced to imprisonment for three years on both counts, the sentences to be served consecutively. Martins was sentenced to three years on each count, the sentences to be served concurrently. Each was sentenced to a special parole term of two years on each count, to be served consecutively by Rodriguez, Albernaz and Smigowski, and concurrently by Martins.

They note that, had they conspired to import marijuana from a freighter located in international waters into some country other than the United States, they would not have committed a crime against the United States or be subject to its jurisdiction. They contend that the government induced them to conspire to import the marijuana into, and distribute it within, the United States rather than another country. In addition, appellants raise the related issue that importation into the United States was suggested by the government; therefore, they were enmeshed in a crime fomented by the state. This misconduct, they urge, required their acquittal. *See United States v. Oquendo,* 5 Cir. 1974, 490 F.2d 161, where the court approved submitting to the jury both the traditional entrapment defense and the different but related entrapment defense discussed in *United States v. Bueno,* 5 Cir. 1971, 447 F.2d 903, *cert. denied,* 1973, 411 U.S. 949, 93 S.Ct. 1931, 36 L.Ed.2d 411.[5]

▇ We need not consider and endorse or disclaim the legal bases on which these contentions are postulated because the factual hypotheses on which they were also based were not established. The trial judge submitted each contention to the jury under an adequate charge,[6] and there was a sufficient evidentiary basis for the jury to conclude, beyond a reasonable doubt, that the defendants were predisposed to import marijuana into the United States, and were neither entrapped into doing so nor enmeshed in crime by federal agents.

▇ Appellants also contend that the charge failed adequately to allocate the burden of proof with respect to the standard entrapment defense. The government has the "ultimate burden [of] proving beyond reasonable doubt that predisposition and not inducement was the cause of the crime." *United States v. Tate,* 5 Cir. 1977, 554 F.2d 1341, 1344; *United States v. Groessel,* 5 Cir. 1971, 440 F.2d 602, 606, *cert. denied,* 1971, 403 U.S. 933, 91 S.Ct. 2263, 29 L.Ed.2d 713. At the point where the court discussed entrapment, it did not specifically describe the allocation of proof. However, it properly indicated that a reasonable doubt as to inducement required acquittal.[7] The jury was instructed that the general burden of proof beyond reasonable doubt was on the government, and it was evident from the charge as a whole that this allocation governed the entrapment defense. This court has approved similar instructions. *United States v. Banks,* 5 Cir. 1973, 475 F.2d 1367, 1369; *see also United States v. Groessel, supra,* 440 F.2d at 607.

### III.

The trial court also included in the charge to the jury the following statement with

---

5. In *Bueno,* this court held that entrapment is established as a matter of law whenever the contraband in question is supplied to the defendant by a government agent, even where the defendant is predisposed. *Bueno* was effectively overruled by *Hampton v. United States,* 1976, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113.

6. Appellants complain that the court did not instruct that jurisdictional entrapment could occur if they had a predisposition to commit crimes only against other countries. Even if predisposition must contemplate a particular jurisdiction, this was adequately explained in the charge which provided in relevant part:

In the event the evidence establish[es] that the government induced the defendant to import and/or distribute the marijuana into the United States, as opposed to some other jurisdiction or country, then the defense of entrapment will lie.

7. The charge read:

If you, the jury, should find beyond a reasonable doubt from the evidence in the case that before anything at all occurred respecting the alleged offense involved in this case, the defendants were ready and willing to commit the crimes, such as charged in the indictment, whenever the opportunity was afforded and that the Government officer or their agent did no more than offer the opportunity, then the jury should find that defendants are not victims of entrapment.

On the other hand, if the evidence should leave you with reasonable doubt as to whether the defendants had the previous intent or purpose to commit any offense of the character charged and did so only because they were induced or persuaded by some officer or agent of the Government, then it is your duty to acquit them.

respect to the general reasonable doubt standard:

A reasonable doubt means a doubt that is based on reason and common sense. Such doubt must be substantial rather than speculative.

In *United States v. Alvero,* 5 Cir. 1972, 470 F.2d 981, 982–983, this court reversed a conviction because the court charged:

"It is not a speculative doubt, but any substantial reasonable doubt, common, ordinary horsesense doubt . . . a *very* substantial doubt, let me put it that way, of the guilt of the defendant."

(Emphasis added.)

However, in *United States v. Turk,* 5 Cir. 1976, 526 F.2d 654, 669, *cert. denied,* 1976, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84, and in *United States v. Muckenstrum,* 5 Cir. 1975, 515 F.2d 568, 570, *cert. denied,* 1975, 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406, we sustained a verdict despite our express disapproval of a charge stating:

Such doubt must be substantial rather than speculative, that is, a defendant is never to be convicted on mere suspicion or conjecture.

■ It certainly would have been better for the charge to be given in other terms. *But cf.* LaBuy, Jury Instructions in Federal Criminal Cases § 6.01–3. There is no want of jurisprudence with respect to how the reasonable doubt standard may be explained. *See* discussions in *In re Winship,* 1970, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368; *Holland v. United States,* 10 Cir. 1954, 209 F.2d 516, 522–523, *aff'd,* 1954, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150. Little new can, or should, be added after 200 years of judicial use of the same term. But the charge given is sufficiently akin to the ones permitted in *Turk* and *Muckenstrum,* where substantial doubt was employed to contrast speculation, to warrant affirmation. Unlike the charge in *Alvero,* it does not directly equate reasonable doubt with "very substantial doubt" or even with a "substantial doubt" by use of an introductory phrase such as, "let me put it th[is] way."

We note that the Seventh Circuit Court of Appeals has wrestled with the equation of reasonable doubt with substantial doubt on a number of occasions, and, although it expressly disapproved the formulation, it has not yet found reversible error. *United States v. Crouch,* 7 Cir. 1976, 528 F.2d 625, 630, 631, *cert. denied,* 1976, 429 U.S. 900, 97 S.Ct. 267, 50 L.Ed.2d 184; *United States v. Shaffner,* 7 Cir. 1975, 524 F.2d 1021, 1023 n. 2, *cert. denied,* 1976, 424 U.S. 920, 96 S.Ct. 1126, 47 L.Ed.2d 327; *United States v. Lawson,* 7 Cir. 1974, 507 F.2d 433, 440, *cert. denied,* 1975, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762. *Compare United States v. Bridges,* 7 Cir. 1974, 499 F.2d 179, 185–186, *cert. denied,* 1974, 419 U.S. 1010, 95 S.Ct. 330, 42 L.Ed.2d 284. Most recently the Supreme Court noted, "this definition, though perhaps not in itself reversible error, often has been criticized as confusing." *Taylor v. Kentucky,* 1978, 436 U.S. 478, 488, 98 S.Ct. 1930, 1936, 56 L.Ed.2d 468. Additionally, other courts of appeals have considered similar equations and decided in the context of each particular case that a new trial was not required. *United States v. Magnano,* 2 Cir. 1976, 543 F.2d 431, 437, *cert. denied,* 1977, 429 U.S. 1091, 97 S.Ct. 1101, 51 L.Ed.2d 536; *United States v. Fallen,* 8 Cir. 1974, 498 F.2d 172, 177; *United States v. Christy,* 6 Cir. 1971, 444 F.2d 448, 450–451, *cert. denied,* 1971, 404 U.S. 949, 92 S.Ct. 293, 30 L.Ed.2d 266; *United States v. Aiken,* 2 Cir. 1967, 373 F.2d 294, 299, *cert. denied,* 1967, 389 U.S. 833, 88 S.Ct. 32, 19 L.Ed.2d 93. *See also United States v. Gratton,* 7 Cir. 1975, 525 F.2d 1161, 1162, and *United States v. Atkins,* 8 Cir. 1973, 487 F.2d 257, 260, where the courts found similar instructions were not plain error in the absence of a Rule 30, Fed.R.Crim.Proc. objection. A timely objection was made here.

■ In reviewing "reasonable doubt" charges, we look to the whole instruction rather than isolate any particular sentence. *United States v. Patman,* 5 Cir. 1977, 557 F.2d 1181; *United States v. Steinkoenig,* 5 Cir. 1973, 487 F.2d 225; *Russell v. United States,* 5 Cir. 1970, 429 F.2d 237; *Baker v. United States,* 5 Cir. 1969, 412 F.2d 1069, *cert. denied,* 1970, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509; *Tillery v. United*

*States*, 5 Cir. 1968, 396 F.2d 790. When viewed contextually, the reference does not constitute reversible error. However, we underscore the gravity of misstating this "bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law,'" *In re Winship*, 1970, 397 U.S. 358, 363, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368, citing *Coffin v. United States*, 1895, 156 U.S. 432, 453, 15 S.Ct. 394, 403, 39 L.Ed. 481, and join the Seventh Circuit in admonishing "that a district court giving a reasonable doubt instruction containing the challenged equation notwithstanding a Rule 30 challenge can reasonably expect a reversal. We would assume further that district courts in view of the expressed dissatisfaction by this court [in *Muckenstrum, Turk, Alvero* and now here] with the language would *sua sponte* eliminate the phrase from their set of standard instructions even in the absence of a Rule 30 objection." *United States v. Wright*, 7 Cir. 1976, 542 F.2d 975, 988.

### IV.

Because of its significance with respect to discussions that follow, we turn aside to consider the issues raised by the appellant Martins concerning the admissibility of his confession. It is contended that this should be suppressed as the fruit of an illegal arrest. *See Wong Sun v. United States*, 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441.

■ At the time of Martins's arrest, the agents had no knowledge that he was connected with the conspiracy although they had seen his name on the passenger manifest of the chartered aircraft and were, of course, aware that he was in the room with Rodriguez the night of the arrest. They did not have probable cause to arrest him.

Hence, we must consider whether the confession that followed his arrest was "come at by exploitation of [the] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun, supra,* 371 U.S. at 488, 83 S.Ct. at 417. In *Brown v. Illinois*, 1975, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62,

45 L.Ed.2d 416, the factors to be considered in this determination were explained:

> The *Miranda* warnings are an important factor . . . in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct are all relevant . . . the burden . . . rests, of course, on the prosecution.

(Footnotes omitted.) *See also United States v. Ceccolini*, 1978, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268.

■ *Miranda* warnings were given to Martins although he refused to sign a form affirming this. *See United States v. Hopkins*, 5 Cir. 1970, 433 F.2d 1041, *cert. denied*, 1971, 401 U.S. 1013, 91 S.Ct. 1252, 28 L.Ed.2d 550. The confession did not actually occur until Martins was transported to DEA offices and after he had the benefit of the intervening advice of Captain Frost; while Frost is not an attorney, Martins was able to obtain meaningful counsel from him. Frost was consulted as, and acted as, a friend, not as a law enforcement official. The offer of helpful information to Frost in exchange for Martins's cooperation came after Frost's advice and did not affect it. The record indicates that Martins knowingly and voluntarily waived his rights to silence and assistance of counsel by insisting that he wanted to tell his story. Finally, the government's conduct was not flagrant or reprehensible. Therefore, the court below did not err in denying the motion to suppress.

■ The only other error raised by Martins alone that warrants comment is the failure of the sentencing court explicitly to find that Martins would not benefit from sentencing pursuant to the Federal Youth Corrections Act, 18 U.S.C. § 5005, *et seq.* At sentencing, Martins' attorney expressly waived sentencing under the Act after discussing the benefits of it with the court.

The record is convincing that, although the court did not recite any talismanic phrases, it did fully consider whether the defendant would benefit from sentencing under the Act. *Bustillo v. United States*, 5 Cir. 1978, 573 F.2d 368; *Mitchell v. United States*, 5 Cir. 1977, 547 F.2d 875; *United States v. Brown*, 5 Cir. 1975, 522 F.2d 207; *United States v. Gamboa-Cano*, 5 Cir. 1975, 510 F.2d 598. *See also Dorszynski v. United States*, 1974, 418 U.S. 424, 444, 94 S.Ct. 3042, 3053, 41 L.Ed.2d 855.

### V.

Appellants complain of alleged misstatements of facts by the prosecutor to the jury and of his expression of personal opinion with respect to the defendants' guilt. In the course of a lengthy argument occupying 20 pages in the transcript, the prosecutor made the following challenged statements:

1) One "Banello," who had been characterized in the testimony as an organized crime figure, was found in the room with Martins and Rodriguez at the time of the arrest. There was no evidentiary basis for this statement.

2) Smigowski was at a key meeting, contrary to the testimony as to who attended the meeting.

3) "Smigowski made some comment about the lights [at one suggested unloaded spot], because he was also concerned about having too much light at night and that it would not be really clever to try a smuggling operation if you are bathed in light. And, of course, he wanted it dark." The only relevant testimony was, "Smigowski asked about the lights, and the brightness of the lights." [8]

4) "Once [the marijuana] arrived in South Florida it would then be trucked to New England and that is why the indictment is in the form of two different counts . . . .. One, it would be imported, and it would then be distributed throughout New England." There was no evidence that the

marijuana would be distributed throughout, or in, New England or that it would be transported there.

5) "The evidence against those defendants *I think* is just overwhelming . . ." and "*I think* you will have to reach . . only one conclusion, that they are guilty of two counts . . ." (emphasis added).

6) "But if you are guilty of a [serious crime] . . . and you are not some kind of hardened criminal or something . . . you would confess . . . And *I think* that is what Willie Martins did."

 "It is improper for counsel to express his personal opinion or to state facts of his own knowledge, not in evidence, and not part of the evidence to be presented," *Dunn v. United States*, 5 Cir. 1962, 307 F.2d 883, 885–886. *See also Berger v. United States*, 1935, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; *United States v. Morris*, 5 Cir. 1978, 568 F.2d 396, 400–02; *United States v. Pariente*, 5 Cir. 1977, 558 F.2d 1186; *United States v. Corona*, 5 Cir. 1977, 551 F.2d 1386; *United States v. Warren*, 5 Cir. 1977, 550 F.2d 219, 229; Code of Prof. Resp., DR 7–106(C)(1), (3), (4), and (7); ABA Standards, The Prosecution Function, §§ 5.8 and 5.9. This rule imposes a duty on the prosecutor to be scrupulous in his argument and to avoid all efforts to obtain a conviction by going beyond the evidence before the jury or by putting the sanction of his office behind the testimony of witnesses. But it does not require a mistrial for every erroneous statement or expression of opinion.

 A prosecutor's expression of personal belief may be tolerated if it is based solely on the evidence introduced and the jury is not led to believe that other evidence, unavailable to them, justified the belief. *United States v. Morris, supra; United States v. Dawson*, 5 Cir. 1973, 486 F.2d 1326, 1330–1331; *United States v. Martinez*, 5 Cir. 1972, 466 F.2d 679, 683, *cert. denied*, 1973, 414 U.S. 1065, 94 S.Ct. 571, 38 L.Ed.2d 469; *cf. United States v.*

---

8. When asked if Smigowski said anything else, Agent Weed testified, "no more than just about the lights."

*Diharce-Estrada*, 5 Cir. 1976, 526 F.2d 637, 641–642.

■ Hence, he may state, "I believe that the evidence has shown the defendant's guilt," but not, "I believe that the defendant is guilty." *United States v. Morris, supra,* 568 F.2d at 402. The expressions of personal belief here expressly referred to the evidence or to conclusions to be drawn from it. Nor did the prosecutor's conjecture regarding Martins amount to a statement of personal belief in his guilt. Indeed it was at least partially favorable insofar as it cast this defendant as remorseful and not a hardened criminal. *Cf. United States v. Corona,* 5 Cir. 1977, 551 F.2d 1386; *United States v. Warren, supra,* 550 F.2d at 229; *United States v. Dunn, supra; Gradsky v. United States,* 5 Cir. 1967, 373 F.2d 706, 710.

■ Further, the court gave an instruction to disregard any personal opinion of the prosecutor. We have stated:

> In every case involving improper argument of counsel, we are confronted with relativity and the degree to which such conduct may have affected the substantial rights of the defendant . . . one "cannot unring a bell"; "after the thrust of the saber it is difficult to say forget the wound"; and finally, "if you throw a skunk into the jury box, you can't instruct the jury not to smell it".

*Dunn v. United States, supra,* 307 F.2d at 886. The court's jury instruction may be considered as a factor in assessing the degree of prejudice. *United States v. Martinez, supra; see also United States v. Crane,* 5 Cir. 1971, 445 F.2d 509, 520.

■ In assessing the prejudicial impact of such assertions, we must also consider the strength of the evidence against each defendant who might have been prejudiced. *Berger v. United States, supra,* 295 U.S. at 89, 55 S.Ct. at 633; *United States v. Warren, supra,* 550 F.2d at 229. "[I]n close cases improper remarks by the prosecuting attorney may carry 'much weight against the accused when they should properly carry none.'" *United States v. Diharce-Estrada,* 5 Cir. 1976, 526 F.2d 637, 642. In this

regard, the prosecution itself conceded, and we agree, that the evidence against Martins was "somewhat different" than the others; absent his confession, it is doubtful that it would have withstood a motion for a directed verdict of acquittal. With Martins's confession in evidence, however, the case against him with respect to participation in the conspiracy to import was overwhelming.

■ Considering the case as a whole, we conclude that these statements did not prejudice the substantial rights of Martins with respect to Count I; the evidence against him was so strong that the same verdict would have resulted had they not been made. We delay consideration of the evidence against Martins with respect to Count II. Likewise, we postpone consideration of the sufficiency of the evidence with respect to Smigowski as to both counts so that the cumulative impact of the various errors he complains of may be assessed with respect to the sufficiency of the evidence against him.

■ Obviously Albernaz and Rodriguez were not prejudiced with respect to either count. None of the statements was specifically directed at either of them and the case against these two defendants was likewise overwhelming.

## VI.

■ The standard for reviewing the sufficiency of the evidence in criminal cases has repeatedly been stated by this court:

> [I]f the trial or appellate court is satisfied that the jury could not reasonably conclude that the evidence fails to exclude every reasonable hypothesis but that of guilt then the trial court, or on appeal, this Court must hold that "the jury must necessarily have had a reasonable doubt as to the inconsistency."

*United States v. Caro,* 5 Cir. 1978, 569 F.2d 411, 416, quoting from *United States v. Haggins,* 5 Cir. 1977, 545 F.2d 1009, 1012. *See also United States v. Pinner,* 5 Cir. 1977, 561 F.2d 1203, 1207; *United States v. Nazien,* 5 Cir. 1974, 504 F.2d 394, 395, *cert. denied,* 1975, 420 U.S. 964, 95 S.Ct. 1358, 43

L.Ed.2d 443. The evidence must be viewed in the light most favorable to the government. *Glasser v. United States,* 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.

"[T]here must be proof beyond a reasonable doubt that a conspiracy existed, that the accused knew it and, with that knowledge, voluntarily joined it." *United States v. White,* 5 Cir. 1978, 569 F.2d 263, 267; *United States v. Caro, supra; United States v. Gutierrez,* 5 Cir. 1977, 559 F.2d 1278, 1280; *United States v. Bright,* 5 Cir. 1977, 550 F.2d 240; *see also United States v. Barrera,* 5 Cir. 1977, 547 F.2d 1250.

In a conspiracy under 21 U.S.C. § 846 or 21 U.S.C. § 963, there is no need to allege or prove overt acts. *United States v. White,* 5 Cir. 1978, 569 F.2d 263, 266; *United States v. Thomas,* 5 Cir. 1978, 567 F.2d 638, 641; *United States v. Palacios,* 5 Cir. 1977, 556 F.2d 1359, 1364 n. 9. Although as this court has emphasized, "[p]roof of an agreement to enter into a conspiracy is not to be lightly inferred," *United States v. White, supra,* 569 F.2d at 267, quoting *United States v. Johnson,* 5 Cir. 1971, 439 F.2d 885, 888, *cert. denied,* 1971, 404 U.S. 880, 92 S.Ct. 213, 30 L.Ed.2d 161, there was sufficient evidence from which an agreement to distribute could reasonably be inferred.

With respect to Smigowski's presence at various meetings, the government relies upon the three statements that he made:

1) When the conspirators planned to use a marina as a site to unload the Catchalot II, he asked about the lights there, and, as a result, they moved to a darker spot;

2) After Weed's group had agreed to arrangements whereby they would keep a ton of marijuana, he commented that it was worth $500,000 and, therefore, they would not lose money, which may have been an attempt to reassure the agents; and,

3) He told Agent Weed, when asked, that Rodriguez and Albernaz were out at sea coordinating the rendezvous and, therefore, Weed did not have to do it. Additionally, when asked to be introduced to the princi-

pals of his organization by Weed, Rodriguez arranged a meeting at which Smigowski was present.[9]

"[M]ere association with other persons involved in criminal enterprise is insufficient to prove participation in a conspiracy." *United States v. Barrera, supra,* 547 F.2d at 1257, and cases cited therein. Proximity to the crime or even actual presence at the scene of the crime is not sufficient. *Id.,* 547 F.2d at 1256, and cases cited therein. *See also Gutierrez, supra,* 559 F.2d at 1280–1281; *Caro, supra,* 569 F.2d at 418; *United States v. Duckett,* 5 Cir. 1977, 550 F.2d 1027. "[M]ere knowledge, acquiescence or approval without cooperation or agreement to cooperate is not enough to constitute one a part to a conspiracy." *United States v. Mendez,* 5 Cir. 1974, 496 F.2d 128, 130.

With respect to the importation scheme (Count I), the jury could conclude beyond a reasonable doubt that Smigowski was more than a sympathetic spectator. It was entitled to infer from the facts presented that Smigowski was a quiet but active member of the conspiracy. His knowledge and presence are not a basis of guilt in themselves, but, taken together with his statements, they provide more than the "slight basis" required to connect him with the conspiracy shown to exist. *United States v. Cadillac Overall Supply Co.,* 5 Cir. 1978, 568 F.2d 1078; *United States v. Bolts,* 5 Cir. 1977, 558 F.2d 316, 324, and cases cited therein. With respect to Smigowski's conviction on Count I, the various errors reviewed in Part V were clearly harmless. At the worst the prosecutor, in summing up, placed Smigowski erroneously at one key meeting; there was indisputable evidence that he attended others. The prosecutor's statements with respect to distribution related only to Count II. The expression of opinion as to the weight of the evidence was not an endorsement of his case by the prosecution. *United States v. Morris, supra.*

---

9. Although this might constitute hearsay that would not be admissible through the co-conspirator exception without independent proof of a conspiracy, it was not objected to at trial.

■ There is little direct evidence with respect to a conspiracy to distribute the marijuana after it was imported. There was mention of the use of Winnebagos to transport the marijuana, and Rodriguez indicated that his group was short on "front money" from which it might be inferred that there would be a subsequent sale. The load consisted of approximately 1100 fifty-pound bales, far more than the appellants could personally consume in the course of many lifetimes of furious effort. The very size of a narcotics cache can be sufficient to show intent to distribute under Section 841. *United States v. Perry*, 5 Cir. 1973, 480 F.2d 147 (188 pounds of hashish); *United States v. Mather*, 5 Cir. 1972, 465 F.2d 1035, *cert. denied*, 1972, 409 U.S. 1085, 93 S.Ct. 685, 34 L.Ed.2d 672 (197.75 grams of cocaine); *United States v. Rodriguez*, S.D.Tex.1974, 375 F.Supp. 589, *aff'd*, 5 Cir. 1974, 497 F.2d 172 (376 pounds of marijuana). *Cf.* cases finding amount too small to infer intent to distribute: *Turner v. United States*, 1970, 396 U.S. 398, 423, 90 S.Ct. 642, 655–56, 24 L.Ed.2d 610 (less than one gram cocaine); *United States v. Olvera*, 5 Cir. 1975, 523 F.2d 1252 (two grams cocaine).

■ Although there was no direct evidence that Albernaz and Rodriguez planned to distribute the marijuana in the United States, this inference might reasonably be drawn from the plan to import it and from the additional evidence concerning them to which we have just referred. If its ultimate destination were, for example, Canada, it is hard to imagine why the appellants would risk bringing it into American borders. In this regard, we must consider the instruction with respect to the definition of distribution:

> Distribution means, with respect of any article, transferring *into* the United States some or all of that article to another individual while in the United States.

(Emphasis supplied.) As the italicized word emphasizes, this instruction was erroneous; while the error may have resulted from a slip of the tongue or from inadvertence, it acquires significance in the light of the nature of the two counts and the poverty of evidence, at least as to some of the defendants, concerning what they knew about the destination and disposition of the smuggled cargo.

Before the charge was given, the government stated for the record that it thought the charge did confuse distribution with smuggling; counsel and the court agreed that the charge would be changed by substituting "while within the United States" for "into," but the court, apparently inadvertently, neglected to make the actual correction. Indeed, in other parts of the instruction, the court correctly stated the law:

> In Count II, the defendants are accused of conspiring to distribute a controlled substance in the United States while within the United States.

And:

> Count II alleges that during the same period, the defendants and other alleged conspirators knowingly and willfully conspired to distribute 30 tons of marijuana in the United States while within the United States.

■ In determining whether this and other errors require reversal, we must determine whether these errors might have contributed to the verdict that was reached, *United States v. Arias-Diaz*, 5 Cir. 1974, 497 F.2d 165, *cert. denied*, 1975, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761; *Addison v. United States*, 5 Cir. 1963, 317 F.2d 808, *cert. denied*, 1964, 376 U.S. 905, 84 S.Ct. 658, 11 L.Ed.2d 605, considering the weight of the evidence pointing to conviction. *United States v. Kilrain*, 5 Cir. 1978, 566 F.2d 979; *Chapman v. United States*, 5 Cir. 1977, 547 F.2d 1240, 1250, *cert. denied*, 1977, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393; *United States v. Demchak*, 5 Cir. 1977, 545 F.2d 1029; *Null v. Wainwright*, 5 Cir. 1975, 508 F.2d 340, *cert. denied*, 1975, 421 U.S. 970, 95 S.Ct. 1964, 44 L.Ed.2d 459; *Loftis v. Beto*, 5 Cir. 1971, 450 F.2d 599; *Lewis v. United States*, 5 Cir. 1967, 375 F.2d 772.

■ The distribution instruction was not unduly prejudicial to Rodriguez, and Albernaz; the evidence against them was overwhelming albeit indirect, and the im-

pact of the mistake was lessened by the subsequent correct definition of the law. *See United States v. Wilkinson*, 5 Cir. 1972, 460 F.2d 725.

■■■ However, there was literally no evidence with respect to the involvement of Martins and Smigowski in a distribution scheme except what might be inferred from their participation in an agreement to import it. The direct and circumstantial evidence that they were peripheral participants in the importation scheme does not refute, beyond a reasonable doubt, the hypothesis that they had no knowledge of a conspiracy to distribute once it reached these shores.

Unlike Rodriguez and Albernaz, who perforce had to make some arrangements to dispose of their treasure, Smigowski and Martins could each receive his reward and be done with the scheme. Unlike Rodriguez and Albernaz, who, according to the evidence, had contacts outside the Miami area, needed front money, and planned to use Winnebagos, Smigowski or Martins were not shown to have been connected with the actual arrangements for importation.

There was evidence that Smigowski and Martins were parties to the importation scheme, but there is no evidence that would establish beyond reasonable doubt that they would likely come in possession of the haul once it arrived, share in its proceeds thereafter, or other evidence from which it could in turn be inferred that they were privy to plans to distribute the contraband. We have already noted that possession of a large supply of a prohibited substance may justify the inference that the possessor intended to distribute it, but there was no evidence that Smigowski and Martins had sufficient dominion over or interest in the marijuana to warrant the inference.

■■■ It is well established that one who knows of a conspiracy and intentionally acts in furtherance of it, is culpable as a conspirator. *Direct Sales Co. v. United*

States, 1943, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674; *United States v. Becker*, 5 Cir. 1978, 569 F.2d 951. But there is no evidence whatever that, at the time of Martins's and Smigowski's contribution to the importation scheme, they knew that a conspiracy to distribute had been formed. Although they may be charged with knowledge that such a scheme would likely be formed once the haul arrived, this is not sufficient to exclude, beyond reasonable doubt, the hypothesis that they did not then either join in it or even know of it.

■■■ Although the inference to be drawn against either Smigowski or Martins or both is a reasonable one, the proof of guilt as to each of them with respect to Count II was insufficient to meet the reasonable doubt standard. Hence, their retrial on that count is precluded by the double jeopardy clause. *Burks v. United States*, 1978, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1. Accordingly, we find sufficient evidence to warrant Smigowski's and Martins's convictions on Count I but must dismiss Count II of the indictment with respect to each of them.

### VII.

Finally, all appellants contend that the two counts of conspiracy charged in the indictment were but "one offense," and that, therefore, the imposition of consecutive sentences violates the double jeopardy clause.

This court considered the issue whether violations of 21 U.S.C. § 846 and § 963 [10] constitute but one offense in *United States v. Houltin*, 5 Cir. 1976, 525 F.2d 943, and decided that, even if there "was only one conspiracy . . . Congress may choose to punish two aspects of that behavior without contradicting the Double Jeopardy Clause." 525 F.2d at 950. That decision was vacated, *sub nom. Croucher v. United States*, 1977, 429 U.S. 1034, 97 S.Ct. 725, 50 L.Ed.2d 745.[11] Were we free to consider

---

10. *See* note 1 *supra*.

11. After the Supreme Court vacated *Houltin* for reconsideration with respect to whether a

compelling federal interest would be served by both convictions, this court accepted the government's decision to withdraw the charge of conspiracy to possess (Count II), and its

that problem anew, we would conclude, contrary to the conclusion in *Houltin*, that the double jeopardy clause prohibits the punishment of a single conspiracy by more than one penalty. However, the reasoning of *Houltin* has been adopted by two panels of this court. *United States v. Dyar*, 5 Cir. 1978, 574 F.2d 1385, 1389; *United States v. Smith*, 5 Cir. 1978, 574 F.2d 308. Although the statements with respect to this issue in both of these cases may be distinguished as obiter dictum,[12] they express the views of a number of members of this court.[13] Under these circumstances, we believe that we are required to treat these decisions as binding, set forth the reasons for our disagreement with them, and permit the parties to petition this court for a rehearing *en banc*.

In *United States v. Adcock*, 6 Cir. 1973, 487 F.2d 637, and *United States v. Honneus*, 1 Cir. 1974, 508 F.2d 566, *cert. denied*, 1975, 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101, the courts considered the very conspiracy statutes charged here, 21 U.S.C. §§ 846 and 963, and concluded that, although each concerns different illegal objectives, where a single agreement violates both statutes, the defendants have engaged only in one conspiracy and may be punished only once. *See also United States v. Mori*, 5 Cir. 1971, 444 F.2d 240, 241–245, *cert. denied*, 1971, 404 U.S. 913, 92 S.Ct. 238, 30 L.Ed.2d 187, where this court held that, under the facts, an agreement to import a narcotic drug and an agreement to travel in foreign commerce to promote unlawful activity were but one conspiracy and sentence must be imposed on only one count.

These conclusions all rely upon *Braverman v. United States*, 1942, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23, in which the court held that, when a single agreement is made, "[t]he one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one." *Id.*, 317 U.S. at 53, 63 S.Ct. at 102. This is true "however diverse its objects." *Frohwerk v. United States*, 1919, 249 U.S. 204, 210, 39 S.Ct. 249, 252, 63 L.Ed. 561. The court in *Honneus, supra*, recognized that Congress has the power to enact such overlapping statutes and that defendants could simultaneously be prosecuted and convicted under each, for it might be difficult or impossible for the grand jury definitely to determine in advance which set of laws the conspiracy violated if proved; if, however, the defendants were convicted of both, they could be sentenced under only one.

The opposite result was reached in *United States v. Marotta*, 9 Cir. 1975, 518 F.2d 681, with respect to these statutes. But, in surveying the jurisprudence, the Ninth Circuit failed to take note of the essential distinction: a single *act* may con-

---

decision not to withdraw the charge with respect to conspiracy to import (Count I) was not challenged. *United States v. Houltin*, 5 Cir. 1977, 553 F.2d 991 (*Houltin II*). We stated in *Houltin II*, "In all other respects this Court's judgment and that of the district court are reaffirmed." But because there was only one conviction remaining, the court could not be reaffirming that portion of *Houltin I* that addressed the double jeopardy issue. A vacated judgment is not binding. *See* 1B Moore's Federal Practice § 0.416[2] (1974).

We note also that counsel in *United States v. Herrera-Vinagas*, 5 Cir. 1978, 573 F.2d 1308, raised the double jeopardy issue with respect to these same statutes, but the court did not address the issue in its unpublished per curiam affirmance.

**12.** In *Smith*, two separate conspiracies were charged and proved: one for violation of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961, *et seq.*, and one for conspiracy to distribute marijuana, 21 U.S.C. § 846. The court specifically stated, "A cursory examination of the offenses involved here reveals that they are not the same," and that each involved separate elements. 574 F.2d at 310. In *Dyar*, concurrent sentences were imposed, hence it was not necessary to consider the issue.

**13.** Although *Smith* was a per curiam opinion, court records reveal that it was authored by Judge Fay. As a concurring member of this panel, Judge Fay has authorized me to state that, upon reflection, he is of the opinion that the view adopted here is a preferable one.

stitute two offenses if it violates two *substantive* statutes, but, even if a single *agreement* has more than one unlawful objective, it may not truly constitute two *conspiracies.* It is the *agreement* that is illegal in a conspiracy; if there is only one agreement, there is but one offense though its objectives are multiple. However, a single act may cause more than a single consequence; therefore, one act may be prosecuted and punished as more than a single offense. *See Gore v. United States,* 1958, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405, which involved violation of several substantive statutes by one act of sale. *But cf. Simpson v. United States,* 1978, 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70. This distinction is drawn in *Braverman* where the court distinguished the case before it (a single conspiracy that appeared to violate two separate statutory provisions) from the case of "a single *act* which violates two statutes," as evidenced by its citation of *Blockburger v. United States,* 1932, 294 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 and *Albrecht v. United States,* 1927, 273 U.S. 1, 47 S.Ct. 250, 71 L.Ed. 505.

A single agreement to rob a bank, kill the guard, steal a car and flee contemplates the possible commission of a number of crimes. But if there is only one agreement, it is the agreement that is the offense; the agreement itself rather than its imagined objectives is the only concrete harm that has occurred. By contrast, a person who fires one bullet and kills two different persons has wrought two distinct social harms, and society may punish both.

Unlike the present case, *Braverman* involved *one* conspiracy statute which made it illegal to conspire to violate a number of substantive laws. Here we are presented with two different conspiracy statutes each of which makes it illegal to conspire to a particular end. But this is not an adequate basis for reaching a different result from the one determined in *Braverman.* Here the facts showed that there was but one conspiracy regardless whether its objectives are proscribed by two discrete laws such as 21 U.S.C. §§ 846, 963, or by one law such as former 18 U.S.C. § 88,[14] considered in *Braverman,* which proscribed objectives by reference to other statutes. *Cf. Developments in the Law—Conspiracy,* 72 Harv.L.Rev. 920, 964–966 (1959); LaFave & Scott, Criminal Law, § 62 at 479–480 (1972). For, as the court said in *Braverman:* "[t]he one agreement cannot be taken to be several agreements and hence several conspiracies because is envisages the violation of several statutes rather than one." *Id.,* 317 U.S. at 53, 63 S.Ct. at 102.

The problem was recognized in the careful opinion in *Houltin, supra,* and the court distinguished the situation where it is charged that *one agreement* violates the general conspiracy statute and a specific conspiracy statute (as charged in *Mori, supra*) and the case where there are *two specific* conspiracy statutes. We cannot accept this as a valid distinction. It would permit the Congress to penalize a single *agreement* by a multitude of separate conspiracy statutes so long as they are specific.

This court has found, in other contexts, that but a single conspiracy exists even though the agreement that constitutes it has several objectives and aims at the commission of several offenses. *United States v. Elliott,* 5 Cir. 1978, 571 F.2d 880, 902; *United States v. Bolts, supra,* 558 F.2d at 325. It is for this reason that the government need prove only that a conspirator agreed to one of the many objectives charged to hold him liable for the other objectives of the agreement, *United States v. Bolts, supra.* See also *United States v. Decker,* 5 Cir. 1976, 543 F.2d 1102, *cert. denied,* 1977, 431 U.S. 906, 97 S.Ct. 1700, 52 L.Ed.2d 390.

Our conclusion that only one conspiracy existed is consistent with our finding sufficient evidence that Smigowski and Martins agreed to only one objective, importation, of a multiple objective conspiracy: that does not imply that there was more than one agreement, merely more than one objective. As we stated in *United States v.*

14. Now 18 U.S.C. § 371.

*Elliott, supra,* 571 F.2d at 902, "the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agreement is to commit one or many crimes, it is, in either case, that agreement which constitutes the conspiracy which the statute punishes." Quoting *Braverman v. United States, supra,* 317 U.S. at 53, 63 S.Ct. at 102.

Because one conspiracy may have many illegal objectives, it will necessarily involve a number of sub-agreements to commit each of these specified objectives. Some members may concur in only some of the many objectives, yet they are liable for all because there is but one scheme, one enterprise, one conspiratorial web. *See United States v. Becker,* 5 Cir. 1978, 569 F.2d 951, 960–61; *United States v. Baldarrama,* 5 Cir. 1978, 566 F.2d 560, 565–66; *United States v. Bolts, supra.* If each stitch in that web were treated as a separate conspiracy, infinite bases for liability could be confected, *see United States v. Papa,* 2 Cir. 1976, 533 F.2d 815, 820, and cases cited therein. Here, for example, each conspirator might be charged with 16 separate conspiracies to import or distribute with each of the 16 other conspirators; over 200 conspiracies could be charged. Hence, the conspiracy must be defined as broadly as the reach of vicarious liability.[15]

For example, in a chain conspiracy, the distributor and exporter may have one agreement to import, and the distributor and seller may have another agreement to distribute, yet one conspiracy exists, and the exporter and seller are liable for each other's acts, although they never agreed upon the same objectives. *United States v. Bruno,* 2 Cir. 1939, 105 F.2d 921, 922, *rev'd on other grounds,* 1939, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257; *see United States v. Papa,* 2 Cir. 1976, 533 F.2d 815, 820–821, *cert. denied,* 1976, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329. *See also United States v. Morrow,* 5 Cir. 1976, 537 F.2d 120, 126, *cert. denied,* 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806.

 Had the distribution scheme succeeded, Smigowski and Martins could be held vicariously liable for it because it was a related objective of the one conspiracy. If the conspiracy to distribute were a completely separate offense from the conspiracy to import, then, even had the conspiracy to distribute been successful, Smigowski and Martins could not be convicted of participation in it by virtue of the joinder in the agreement to import. In some circumstances, however, that very joinder in an agreement to reach an illicit objective (itself part of the conspiracy to reach a larger but encompassing objective) renders the conspirator liable for objectives he did not himself concur in. *United States v. Bruno, supra,* and progeny. Here, the conspiracy did not succeed; Smigowski and Martins were charged merely with making an agreement that in fact was aborted. Therefore, the evidence was not sufficient to make a jury case on the alleged conspir-

---

**15.** According to one commentator:

Whether several offenses are the multiple objects of a single agreement or the separate objects of distinct agreements is of considerable importance for purposes of multiple punishment and double jeopardy, since generally there can be only one conspiracy conviction when there has been only one agreement. Assuming, however, that the prosecution is able to show separate agreements to each of the objects, it does not seem that liability for several conspiracies must necessarily follow. When two men who have agreed to commit a rape later agree to commit a burglary, there is a new object dimension and hence strictly speaking a new agreement. If the first crime has been completed, and the parties are no longer united by their adherence to a common undertaking when the second is agreed to, the old grouping dangerous to society has been dissolved, and the new agreement creates a new one . . . But when the second object is agreed to before the attainment of the first, it seems that this new agreement should be disregarded since no new grouping is created by it. . . . [S]ince the law does not punish separately for the multiple objects of a single agreement, punishment for both agreements in this case tends to place a premium upon foresight in crime.

*Developments in the Law—Conspiracy,* 72 Harv.L.Rev. 920, 930 (1959).

acy to distribute. The two conspiracies were not separate crimes for double jeopardy purposes because they embraced but one ultimate overall goal. The commission, or even the attempted commission, of several offenses constitutes several crimes, but one *agreement* to violate a number of laws remains but one crime if it is charged merely as a conspiracy and not as a substantive offense.

■ Of course, there may also be two or more agreements in a given case and each may violate different, or identical, conspiracy statutes. *See generally* Note, *Resolution of the Multiple Conspiracies Issue Via a "Nature of the Enterprise" Analysis: The Resurrection of Agreement*, 42 Brooklyn L.Rev. 243 (1975). Distinguishing between one overall conspiracy and several separate conspiracies is "a frustrating and challenging task." *United States v. Perez*, 5 Cir. 1973, 489 F.2d 51, 57, *cert. denied*, 1974, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664. But there is ample jurisprudence to assist in that task. *See, e. g., United States v. Becker, supra; United States v. Baldarrama, supra; United States v. Morrow, supra; United States v. Perez, supra.* "In essence, the question is what is the nature of the agreement. If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, then it is one conspiracy." *United States v. Perez, supra*, 489 F.2d at 62.

■ Here some conspirators may have agreed only to the importation and others to importation and distribution, but all were part of a common scheme aimed at moving the marijuana from the fields of Colombia to its consumers. It is no defense to the one conspiracy theory that some conspirators were unaware of the precise role played by others. *United States v. Becker, supra; Blumenthal v. United States*, 1947, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154. As we noted at the outset, Counts I and II are identical except with respect to the alleged objective of the agreement and the statute charged to have been violated. However, we are constrained by *Dyar, supra*, and

*Smith, supra*, to conclude that appellants may be punished twice for their agreement; hence we affirm the conviction of appellants Rodriguez and Albernaz with respect to both counts. For reasons stated previously, the convictions of appellants Smigowski and Martin on Count II are reversed and that count of the indictment is ordered dismissed with respect to them.

## VIII.

In a separate opinion in *United States v. Cadena*, 5 Cir. 1978, 585 F.2d 1252, we consider the question whether the evidence seized during the search of the freighter was illegally obtained and was properly admitted. However, this decision does not turn on the conclusion reached there. Assuming arguendo that all evidence obtained aboard the freighter should have been suppressed, there were 150 bales of marijuana aboard the Catchalot II, and other overwhelming evidence against each of the defendants. This conclusion makes it unnecessary for us to determine whether the appellants have standing to challenge the search of the freighter.

Having carefully reviewed the record, we are persuaded that appellants' additional contentions are without merit. Accordingly, the judgment is AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.

Affirmed in part, reversed in part and remanded.

## ON PETITION FOR REHEARING EN BANC.

Before BROWN, Chief Judge, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN and VANCE, Circuit Judges.

BY THE COURT:

A majority of the Judges in active service, on the Court's own motion, having determined to have this case reheard en banc,

IT IS ORDERED that this cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.